U.S. INDUSTRIES, INC., a corporation, Plaintiff–Appellee, Cross–Appellant,

v.

TOUCHE ROSS & CO., George S. Peterson, Jr., John E. Runyan, Joseph A. Bond, Four Seasons Management Company, James O. Barlow, Defendants–Appellants, Cross–Appellees.

Nos. 84–1564, 84–1715 to 84–1719.

United States Court of Appeals, Tenth Circuit.

Aug. 22, 1988.

& Tatum, San Francisco, Cal., and Robert Bartels, Asst. General Counsel, Touche Ross & Co., New York City, were also on the brief), for defendant-appellant Touche Ross & Co.

Richard S. Nemelka, Nemelka, Blakesley & Blakesley, Salt Lake City, Utah, for defendant-appellant James O. Barlow.

John E. Runyan, pro se.

Clark Waddoups, Rooker, Larsen, Kimball & Parr, Salt Lake City, Utah (C. Keith Rooker and Michael M. Later, Rooker, Larsen, Kimball & Parr, were also on the brief), for plaintiff-appellee U.S. Industries.

Warren M. Weggeland, Yano, Murphy, Weggeland and Freidland, P.C., Salt Lake City, Utah, for defendant-appellants Joseph A. Bond and Four Seasons Management Co.

Robert E. Albright and Richard C. Brahm, Lucas, Prendergast, Albright, Gibson & Newman, Columbus, Ohio, for defendant-appellant George S. Peterson, Jr.

Before HOLLOWAY, Chief Judge, BARRETT and BALDOCK, Circuit Judges.

HOLLOWAY, Chief Judge.

U.S. Industries, Inc. (USI) brought this suit against numerous defendants asserting claims under the 1933 and 1934 Securities Acts and a variety of pendent state law claims. The Utah case arose out of a series of transactions relating to sales of health club memberships, and of interests in companies engaged in this business and its financing.

Five defendants found liable have appealed, and defendant Touche Ross & Co. (Touche), found not liable, has appealed the denial of its motion for attorneys' fees and costs. USI has cross-appealed several rulings, including the grant of credit to the defendants for settlement amounts received by USI. A general overview of the complicated facts follows.

## I. FACTS

### A. 1968–1969—The Sale of Kennibec

In 1968, a group of health spa owners—all of whom were defendants at one time or

Paul A. Renne, Cooley, Godward, Castro, Huddleson & Tatum, San Francisco, Cal. (Patrick J. Mahoney and William S. Freeman, Cooley, Godward, Castro, Huddleson

another in the present case—decided to go public.[1]. Rather than go through the process of preparing a registration statement for the Securities and Exchange Commission the spa owners decided to acquire a public corporation and transfer the assets of the spas to the public corporation in exchange for stock. Through this process, the non-public spas would be transformed into a public corporation. As a result, any subsequent public offering of stock would be greatly expedited by the fact that the business was already a public company.

The corporation chosen for this purpose was a shell corporation named Kennibec Mining Company. Based on a predetermined allocation, six million shares of Kennibec stock were distributed to the owners of the various health spas, and the assets of the spas were transferred to Kennibec.

When Kennibec's directors investigated the prospect of a public offering of Kennibec the result of their initial inquiries was not encouraging. Investment bankers that were approached indicated reluctance to underwrite a public offering of Kennibec. In particular, two objections appear to have been advanced. First, a general concern existed that a health spa organization would not be an attractive investment vehicle for public shareholders. Second, the accounting method that had been and was still being used by the various spas—specifically the fact that their books were kept on a cash basis rather than on an accrual basis—made it impossible to prepare a financial statement for submission to the SEC.

In an effort to resolve the second objection, Kennibec's directors began searching for an accounting firm to audit Kennibec. Joseph Bond, Kennibec's secretary-treasurer, contacted three accountants: Lorin Burr, an accountant with Ernst & Ernst; J. Robert Thomas, an accountant at Birrell, Zimmerman & Thomas; and Joseph Burns, an accountant with Touche. Eventually, Bond hired either Birrell, Zimmerman & Thomas or Touche to audit Kennibec.[2] Soon after, the firm of Birrell, Zimmerman & Thomas merged with Touche.

In a memorandum drafted on June 11, 1968, Joseph Burns, the Touche accountant, outlined his view of the appropriate accounting method for auditing Kennibec. In brief, Burns advocated a method under which an amount of income equivalent to the costs associated with acquiring memberships—advertising cost, commissions, and other incentive compensation costs— would be immediately recognized as income at the time the memberships were sold. All other income would be amortized on a decelerating basis over the life of the membership. .

In July 1968, Touche attempted to audit Kennibec for a nine month period ending June 30, 1968. In October 1968, however, Touche refused to complete the audit and instead issued a Disclaimer of Opinion report. According to the report, Kennibec's use of the cash basis method of accounting for the health spas "may [have] result[ed] in a significant overstatement of retained earnings." 262 R. 2403. As a result, Touche concluded, "we have reason to believe that the combined balance sheet does not fairly present the company's financial position in conformity with generally accepted accounting principles." 262 R. 2403–04.

In late September or early October, 1968, Touche again undertook to audit Kennibec, this time for the fiscal year ending September 30, 1968. In that audit, completed in March 1969, Burns rejected the accounting method he had previously endorsed on the grounds that it was "exceptionally conservative," and failed to reflect "the economic facts of the company's operations." 263 R.

---

1. The number of spas was somewhere between thirty and fifty-two. See, e.g., 253 R. 686; 9 R. 1876; 267 R. 3530. It included spas located in California, Washington, Utah, New Mexico, Colorado, Wisconsin, Ohio, Georgia, New York and Pennsylvania. 267 R. 3522–29. The owners of the spas were generally either related or had long-standing business ties.

2. Although Bond's testimony, as well as some documentary evidence, suggested that he hired Birrell, Zimmerman & Thomas, see 267 R. 3544, 3550–51; 262 R. 2494, other documentary evidence supports the position that Bond hired Touche. See, e.g., 267 R. 3551.

2825. Instead, Burns utilized an approach known as the "front-end" method. Under it "all revenue [was] recognized at the time of sale [of the membership contracts] except that an amount equivalent to the total cost of providing member services over the life of the contract [was] deferred." 263 R. 2827. The amount deferred—somewhere between twelve and fifteen percent of the income—was then amortized on a straight line basis.

In the spring of 1969, in preparation for an S–1 Registration Statement to be filed with the SEC, Touche performed a subperiod audit of Kennibec covering the period from September 30, 1968 to April 30, 1969. Before any registration statement was filed, however, the directors of Kennibec began discussing the possibility of merging with another company rather than going public.

One of the companies that had indicated an interest in acquiring Kennibec was USI. On October 20, 1969, USI and Kennibec entered into an Exchange Agreement under which USI would acquire eighty percent of Kennibec's stock in exchange for shares of USI preferred and common stock. The Exchange Agreement provided that Kennibec's executive officers—Rice, Melby and Bond—would remain as the president, vice-president and secretary-treasurer of Kennibec respectively. It also contained a number of warranties and representations including (1) that the financial condition of Kennibec was accurately reported in the company's financial statements according to generally accepted accounting principles consistently applied; (2) that Kennibec had good title and the right to use or lease Kennibec properties as set out in the schedules attached to the Exchange Agreement; (3) that all conflicts of interest, related-party transactions and acts of self-dealing had been fully and fairly disclosed; and (4) that the proceeds from the four million dollar loan from USI to Kennibec would not be used by any of the selling shareholders to satisfy personal obligations.[3] Finally, the sale was expressly conditioned on an unqualified favorable opinion by Touche on the financial condition of Kennibec.

On December 2, 1969, the Exchange Agreement between Kennibec and USI was closed and shortly thereafter Kennibec was renamed Health Industries, Inc. (HI).

### B. 1971–1973—The Creation of FEA

In 1971, several officers of HI submitted a plan to USI's management to create a subsidiary finance company that would purchase membership contracts from HI. When USI rejected the proposal Bond and Lee Schoonmaker, an accountant for Continental Alliance Company, began discussing the possibility of establishing a finance company that would purchase paper from HI. In September 1971, these discussions culminated in the creation of Financial Enterprises of America, Inc. (FEA). FEA was in turn divided into numerous subsidiaries—Financial Enterprises of Florida, Financial Enterprises of Minnesota, Financial Enterprises of Delaware, and the like[4]—whose purpose was to purchase contracts from HI's spas for their individual states. In addition, FEA acquired two corporations—Preferred Discount Corporation, in New York; and National Discount Corporation, in Pennsylvania—from HI for the price of one dollar each. With one exception, these finance companies purchased paper only from spas owned by HI.

Although much of the initial capital for FEA was obtained from passive investors, the list of shareholders quickly expanded to include seventeen directors, officers or employees of HI, including the president, vice-president and secretary-treasurer of HI. 295–A R. 10144–45; 9 R. 1947–50. Because of the need for secrecy, however, the shares were generally registered to a nominee.

In 1971 and 1972, FEA purchased membership contracts from HI. In addition, FEA developed an incentive program to

---

**3.** One of the terms of the Agreement provided that USI would advance a four million dollar loan to Kennibec, to be used primarily for the construction of new spas.

**4.** In all, subsidiaries were established in Florida, Minnesota, Pennsylvania, New York, Utah, Arizona, Georgia, Delaware, Ohio and Kentucky. *See, e.g.,* 295–A R. 10063–86; 9 R. 1913–14.

encourage HI regional directors to increase the amount and quality of the contracts sold to FEA. In September 1972, however, USI's management became concerned that the relationship between HI and FEA was not in HI's best interest. 293 R. 9224. USI's management became aware of rumors of possible conflicts of interest between FEA and HI. 293 R. 9224. In December 1972, USI's board of directors ordered that HI's relationship with FEA be terminated. 293 R. 9225. Despite this directive, FEA continued to purchase HI membership paper through February 1973. 295–A R. 10205–08. Between December 7, 1982 and February 1983, approximately $2.7 million worth of membership paper was transmitted to FEA. 291 R. 8831–32.

In addition, FEA also held approximately $6,000,000 worth of HI membership contracts, all purchased on a full-recourse basis. 291 R. 8833. When USI attempted to receive payment for the contracts which had been sent to FEA after December 7, 1982, however, Schoonmaker refused either to pay for the paper or to return it. In addition, Schoonmaker implied that he might no longer service the other six million dollars worth of HI paper he currently held. As a consequence, USI's management began negotiations to acquire FEA.

On June 8, 1973, HI entered into an agreement with FEA to acquire virtually all its assets for approximately $1.2 million. 296 R. 10,386. For tax purposes HI did not acquire FEA's assets directly. Rather, FEA transferred its principal assets to a wholly owned subsidiary, Financial Enterprises of Kentucky (FEK), and HI then purchased all of FEK's stock.

As part of the purchase agreement, HI sought—and received—a warranty from FEA and its officers that "none of the present or past officers, directors or shareholders of FEA or its subsidiaries, [was] or at anytime ha[d] been an officer, director, or managing agent of [HI], or any of its subsidiaries." 291 R. 8915. In addition,

FEA and its officers represented that "no portion of the purchase price ... [would] be paid, either directly or indirectly, to any present or past director, officer or managing agent of [HI], or any of its subsidiaries." 291 R. 8916. Finally, FEA and its officers warranted that "to the best of their knowledge and information no officer, director or managing agent of [HI] or any of its subsidiaries [was] or at anytime ha[d] been a shareholder, either directly or equitably, of FEA." 291 R. 8916. All of the warranties were admittedly false.[5] 296 R. 10,392–93.

## II. COURT PROCEEDINGS

On May 30, 1975, USI and HI filed a complaint against Bond, FEA and the directors of FEA—Lee Schoonmaker, Connie Schoonmaker and Howard Soloway—alleging violations of the 1933 and 1934 Securities Acts, as well as a variety of pendent state law claims. By May 1, 1979, the plaintiffs had amended their complaint four times and had increased the number of defendants to thirty-five.

Although the Fourth Amended Complaint stated eleven separate causes of action, the plaintiffs' allegations can be divided conceptually into three categories. First, the plaintiffs asserted the existence of a conspiracy, beginning in 1969 and involving employees of Touche and the shareholders of Kennibec, to inflate the value of Kennibec—and consequently its selling price—through the use of an improper and inaccurate accounting method. Second, the plaintiffs alleged a series of violations of federal and common law arising out of the formation and operation of FEA, and the eventual sale of its assets to USI. Finally, the plaintiffs contended that a number of activities by various defendants, acting either in concert or individually—including the creation and operation of such entities

---

5. In addition to the sale of Kennibec, and the creation, operation and sale of FEA, the defendants were involved in a wide variety of other business transactions between 1970 and 1975, a number of which gave rise to claims by USI.

Because all of these activities were limited in scope, implicated only a few of the defendants, and involved relatively small amounts of money, we defer any discussion of their facts until issues arise concerning them.

as Health Equipment,[6] Colorado Development Company,[7] and the Banyan Tree Plaza,[8] to name just three—were in violation of the common law.

In January 1981, Touche filed a Motion for Partial Summary Judgment "on those claims which allege that the front end method of income recognition ... was improper," 7 R. 1316, on the ground that the claims were barred by statutes of limitations. The trial court granted Touche's motion, ruling that the plaintiffs' claims against Touche were barred "insofar as they are based upon Touche's use and approval of the 'front-end' accounting method as a means for recognizing income from sales of Health Industries club memberships...." 8 R. 1574. Despite its resolution of Touche's motion, however, the trial court concluded that "the ruling sought by Touche [did] not dispose of any single claim in its entirety...." 8 R. 1565.

In May 1982, Touche filed a Motion for Summary Judgment, asserting three grounds. First, Touche argued that the plaintiffs' claims "relating to the alleged failure of Touche to disclose certain facts in connection with the 1969 acquisition and the FEA acquisition [were] barred by the statutes of limitations." 11 R. 2162. Second, Touche asserted that the plaintiffs could not have relied on any representations Touche had made because they had "actual knowledge of the undisclosed facts

which [USI] claims Touche concealed from it." 8 R. 3802. Third, Touche contended that any securities law violations arising out of the 1973 sale of FEK required dismissal on the ground that the FEK stocks were not securities covered by the 1933 and 1934 Securities Acts.

The trial court denied Touche's motion. It reiterated its earlier decision that the sale of FEK involved a sale of securities under the 1933 and 1934 Securities Acts; and it concluded that Touche failed to show that the undisputed facts would not support plaintiffs' claim of reliance on Touche's representations. Finally, the trial court ruled that two issues concerning the statutes of limitations remained in dispute:

First, Touche's continued employment by USI, as Health Industries' "independent" auditor until 1978, three years after USI's initial suit, is a fact from which a jury could draw an inference that USI did not have notice of Touche's involvement in the alleged fraud until 1978, and 2) the extensive investigation [by] USI in 1972–73, the results of which are in dispute, with Touche claiming that USI discovered enough to bring suit and USI claiming the investigation to be inconclusive as to suit, appears to the court to possibly justify an inference of due diligence on the part of USI to obtain such notice. The court is of the opinion that Touche has not conclusively disposed of

---

**6.** Health Equipment (HE) was incorporated in 1971 for the purpose of supplying health club equipment to HI. Its beneficial owners included Bond, Runyan, and Leonard Rice. 279 R. 6065. Between January 1971 and January 1973, HE supplied more than a million dollars worth of equipment to HI's spas, 293 R. 9420, earning a net income of more than $100,000. 300 R. 11,365. According to USI, the equipment manufactured by HE was inferior to, and more costly than, other equipment available to HI. *See generally* 293 R. 9423–27; 279 R. 6104–6107.

**7.** Colorado Development Company (CDC) was originally a sole proprietorship established by Runyan to purchase tax properties in Salt Lake City, Utah. 278 R. 5914. In 1970, however, Runyan and Bond incorporated CDC to use as a vehicle for entering into joint real estate activities. 270 R. 5915–16; 278 R. 5924. In the summer or fall of 1970, CDC obtained $11,000 from HI, either as "advice rent on leased prop-

erty" in Louisiana, 278 R. 5936, or as "a loan commitment fee for the purpose of obtaining financing" on the Louisiana property. 278 R. 5936. The property was neither purchased nor leased, and the $11,000 was not repaid to HI. 278 R. 5942.

**8.** The Banyan Tree Plaza was a project to construct a thirty-five story high-rise condominium building in Honolulu, Hawaii. Although the property on which the building was constructed was owned by the Church of Jesus Christ of Latter–Day Saints, 279 R. 6109, Melby, Runyan, Robert Rice, HI and one other party held a seventy-five year lease to the property. 279 R. 6139. In 1973, Robert Rice and Bond, on behalf of HI, subleased HI's interest in the seventy-five year lease to Melby, Rice and Runyan for $10.00 per year. 280 R. 6291. At trial, USI attempted to show that HI had been fraudulently deprived of its interest in the Banyan Tree Plaza project. *See generally* 279 R. 6108–280 R. 6326.

these facts and the inference against notice of Touche's involvement in the fraud that might be drawn therefrom. It should, therefore, be left to the jury to "determine by a preponderance of the evidence whether the action occurred too remotely."

18 R. 3803 (citation omitted).

The court recognized that its resolution of the limitations question could be construed as contrary to the spirit of the earlier Order Granting Interlocutory Summary Adjudication in favor of Touche. 18 R. 3804. The court undertook to clarify its earlier order. That ruling, the court explained, merely held "that plaintiff was barred from asserting that the 'front-end' method was a fraudulent device in and of itself." 18 R. 3804. It did not prevent USI from introducing evidence "relating to the 'front-end' method, where that evidence was introduced with other admissible evidence to establish Touche's fraud." 18 R. 3804. "To the extent the prior order can be read to the contrary," the court concluded, "it is amended." 18 R. 3804.

Trial began against the eleven remaining defendants: Touche, Percy Sanders, John Dewberry, Rey Arnold, Leonard Rice, John Runyan, George Peterson, Joseph Bond, James Barlow, Four Seasons, and Brent Rice.[9] The case was submitted to the jury on April 1, 1983 on extensive special interrogatories. The jury returned its responses seven days later. It found no liability on the part of Touche, Sanders, Dewberry, and Arnold, but found the remaining defendants liable to USI on the 1973 transaction. The jury found no defendants liable on the 1969 transaction.

Arising out of the 1973 sale of FEK to HI, the jury found: (1) that Bond and Leonard were liable for violations of Rule 10b–5, conspiracy to violate Rule 10b–5, aiding and abetting a conspiracy to violate Rule 10b–5, common law fraud, breach of fiduci-

ary duty, and conspiracy to breach a fiduciary duty; (2) that Four Seasons was the alter-ego of Bond, and was guilty of common law fraud, conspiracy to violate Rule 10b–5 and aiding and abetting a conspiracy to violate Rule 10b–5; and (3) that Brent Rice, Barlow and Peterson were liable for conspiracy to violate Rule 10b–5 and conspiracy to breach a fiduciary duty. In addition, Bond and Runyan were found liable for breach of fiduciary duty and conspiracy to breach a fiduciary duty arising out of the formation and operation of Colorado Development Company; Bond and Leonard Rice were held liable for breach of fiduciary duty with respect to Health Equipment; and Bond, Leonard Rice and Runyan were held liable for conspiracy to breach a fiduciary duty with respect to Health Equipment. The jury awarded punitive damages against Peterson, Barlow, Brent Rice and Bond.

When the special verdicts were examined it became apparent that the jury had improperly calculated damages. In particular, for both the 10b–5 violations and the breach of fiduciary duty violations, different amounts of damages were assessed to defendants who were jointly and severally liable. Consequently, the court submitted supplemental special verdict forms to the jury, requiring them to determine the total loss arising out of the various statutory and common law violations. After recalculating the damages, the jury found that (1) Bond, Leonard Rice, Four Seasons, Brent Rice, Barlow and Peterson were jointly and severally liable for $550,000 in damages for the 10b–5 violations arising out of the 1973 sale of FEK to USI; (2) Bond, Leonard Rice, Brent Rice, Barlow and Peterson were jointly and severally liable for $614,000 for the breach of fiduciary duty claims relating to the 1973 sale of FEK to USI; (3) Bond, Four Seasons, and Leonard Rice were severally liable for common law fraud

---

9. A number of the parties state in their briefs that twelve defendants went to trial. However, none of the proceedings, including those seeking directed verdicts, appears to have been directed toward James Latham, one of the defendants listed by the trial court. Moreover, the record does not reflect that Latham was ever represented at trial, or that he took part in any of the proceedings. None of the special verdict forms sought a finding of liability as to him and no judgment was entered against him. As a consequence, we list as defendants only those against whom a judgment was sought at the conclusion of the trial.

arising from the sale of FEK to USI, in the amounts of $300,000, $100,000 and $100,000 respectively; (4) Bond and Runyan were jointly and severally liable for $11,000 for breach of fiduciary duty claims arising out the creation and operation of Colorado Development Company; (5) Bond, Leonard Rice and Runyan were jointly and severally liable in the amount of $45,000 for breach of fiduciary violations with respect to Health Equipment; and (6) Bond was liable for $180,000 in damages arising out of breach of his employment contract with USI. The jury assessed punitive damages of $5000 each against Peterson, Barlow and Brent Rice and $267,500 against Bond.

Despite the jury's recalculation of damages, the defendants asserted that the $550,000 in damages assessed by the jury for the violation of Rule 10b–5 duplicated the jury's award of $614,000 arising out of the fiduciary duty claims.[10] The trial court agreed. In its Memorandum Opinion Regarding Entry of Judgment the court concluded that

> the jury, in arriving at the "total damages suffered by HI as a result of the conspiracy to breach fiduciary duties," simply added the amount of $550,000, which they had just arrived at as being the "total loss plaintiffs suffered as a result of the 1973 [securities] FEK transaction," to the $64,000 breach of fiduciary duties damages, representing the individual gains of defendants Bond and L. Rice, to arrive at the $614,000.

36 R. 7346. Consequently, the trial court reduced the total award by $550,000.

In its Memorandum Opinion the court addressed several additional damages issues. First, the court awarded costs to USI against Bond, Brent Rice, Leonard Rice, Runyan, Peterson, Four Seasons and Barlow and awarded costs against USI to Sanders, Dewberry, Arnold and Touche. Second, the court denied USI's motion for prejudgment interest. Next, the court rejected motions of the defendants and USI to award attorneys' fees. Finally, the court gave the defendants partial credit—amounting to $544,719—for money received by USI in settlements. The jury's verdict, as modified by the court, was entered as judgment. Bond, Peterson, Runyan, Four Seasons, Barlow, and Touche timely appealed and USI cross-appealed.

Defendants present six issues on appeal: (A) Whether the sale of FEK's stock to USI constituted the sale of securities within the meaning of the Securities and Exchange Act of 1934; (B) Whether the assignment provision contained in the 1973 Exchange Agreement between FEA and HI precluded USI from asserting HI's claims against the defendants; (C) Whether the defendants were entitled to receive full credit for settlement amounts received by USI from defendants who settled prior to trial; (D) Whether the trial court erred in resubmitting the question of damages to the jury; (E) Whether the court erred in denying Touche's motion for attorneys' fees; and (F) Whether the court erred in refusing to award Touche certain costs it incurred in defending the case.

In addition, USI raises five issues in its cross appeal: (G) Whether the trial court erred in granting partial summary judgment in favor of Touche concerning the "front-end" accounting method; (H) Whether the court erred when it instructed the jury that for USI to prevail on its conspiracy claims, it must prove the existence of a conspiracy among those who were defendants at the time of trial; (I) Whether the court erred in denying USI's

---

**10.** In their original verdict, the jury had awarded USI $32,000 against Bond and $32,000 against Leonard Rice for the breach of fiduciary duty claims. In addition, the jury had also assessed damages of $10,000 each against Bond, Leonard Rice, Brent Rice, Barlow and Peterson for conspiracy to breach a fiduciary duty. On the supplemental verdict forms, however, the jury awarded a total of $614,000 in damages for the combined claims of breach of fiduciary duty and conspiracy to breach a fiduciary duty. This discrepancy between the jury's original verdict and the supplemental verdict, the defendants argued, demonstrated that the jury arrived at the award of damages for the fiduciary duty claims by adding the amount of Bond's and Leonard Rice's primary liability—$64,000—to the damages awarded under the Rule 10b–5 claim—$550,000. Thus, defendants contended, the Rule 10b–5 award duplicated part of the fiduciary duty award.

motion for prejudgment interest; (J) Whether the court erred in concluding that the jury's award of damages for USI's 10b–5 claim was duplicated by the award for the fiduciary duty claims; and (K) Whether the trial court erred in allowing the defendants credit for money received by USI in settlement.

## III. ISSUES

### A. The Sale of a Business Doctrine

We first address the argument—advanced by Bond, Four Seasons, Barlow and Peterson—that the trial court was without jurisdiction to consider USI's claim that the 1973 sale of one hundred percent of FEK's stock to HI violated federal securities law.[11] According to the defendants, the sale of FEK's stock "involved the acquisition of a business intended to be operated and managed by HI, and not the purchase of a security as an investment by HI with the expectation of deriving profit from the efforts of others." Brief of Appellants Joseph A. Bond and Four Seasons Management Company, at 16. As a consequence, defendants contend, "the transaction did not involve a 'security,' and thus is beyond the scope of the federal securities laws and the jurisdiction of the District Court." *Id.*

■ We do not agree. The position advocated by defendants, commonly known as the sale of a business doctrine, was specifically rejected by the Supreme Court in the companion cases of *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), and *Gould v. Ruefenacht*, 471 U.S. 701, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985). *See Schaafsma v. Morin Vermont Corp.*, 802 F.2d 629, 636 (2d Cir.1986); *Penturelli v. Spector, Cohen, Gadon & Rosen*, 779 F.2d 160, 164 (3d Cir.1985); *St. Philip Towing & Transp. Co. v. Pavers, Inc.*, 768 F.2d 1233, 1234 (11th Cir.1985). In *Landreth* and *Gould*, the Court noted that "where an instrument bears the label 'stock' and possesses all the characteristics typically associated with stock, ... a court will not be required to look beyond the character of the instrument to the economic substance of the transaction to determine whether the stock is a 'security' within the meaning of the [Securities] Acts." *Gould*, 471 U.S. at 704, 105 S.Ct. at 2310.

Because it is undisputed that the shares purchased by HI in the present case bear all the indicia of stock, we conclude that they are securities within the meaning of the federal securities laws. Consequently, the trial court properly exercised its jurisdiction.

### B. The Assignment Provision

On appeal, Bond, Four Seasons and Barlow contend that the trial court erred in refusing to dismiss USI's claims arising out of the 1973 sale of FEK to HI on the ground that USI did not have proper standing to assert the claims.[12] According to these defendants, the 1973 Purchase Agreement prohibited HI from assigning its rights "under and in connection with" the 1973 Agreement without the express written consent of FEA.[13] HI neither sought nor received FEA's written consent

---

11. The defendants also make the related arguments that (1) since the trial court had no jurisdiction over the federal law claims, it erred in exercising pendent jurisdiction over the state law claims; (2) the court erred in refusing to instruct the jury on the "sale of a business" doctrine; and (3) the court erred in instructing the jury that, as a matter of law, USI's purchase of FEK's stock involved the purchase of a security. Because these issues are all contingent upon the erroneous contention that the sale of FEK's stock to HI did not involve the sale of securities, we need not consider them separately.

12. Defendants also contend that the trial court erred in instructing the jury that "USI asserts the claims of this action both in its own right and those that would belong to USI—or to Health ... by assignment." 324 R. 16,881 (Jury Instruction No. 3). Because we conclude that USI was not prohibited from pursuing HI's claims, we likewise reject this claim of error.

13. Paragraph eighteen of the 1973 Purchase Agreement provides in part:

The right of HI under and in connection with this Agreement may be assigned by HI to any of its subsidiaries, but no other assignment shall be made by any party without the prior written consent of the other.

322 R. 16,539.

to assign its claims to USI. Therefore, the attempted assignment of HI's claims to USI was ineffectual, USI lacked standing to assert HI's claims, and the trial court erred in not dismissing them.

■ We cannot agree. A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested, does not forbid assignment of a right to money damages for breach of the contract. Restatement (Second) of Contracts § 322(2)(b)(1981).[14] *See also Fuller v. Favorite Theaters Co. of Salt Lake,* 119 Utah 570, 230 P.2d 335, 336 (1951); *Trubowitch v. Riverbank Canning Co.,* 30 Cal. 2d 335, 182 P.2d 182, 185–86 (1947) and cases cited therein.[15] Consequently, the assignment clause does not prevent USI from pursuing HI's claim.

In the present case, however, defendants argue that the language of the assignment provision indicates not merely an intent to prevent the assignment of the rights and privileges contained in the contract, but also prohibits the assignment of a cause of action. The provision in question, defendants note, prohibits assignment of the "right of HI under and in connection with"

the Agreement. This language, defendants assert, "should not be restricted to apply only to HI's contract rights under the Agreement, but should ... apply to all HI's rights, including choses in action, since it is presumed that *all* HI's rights were intended to fall within the scope of the consent requirement...." Brief of Appellant Joseph A. Bond and Four Seasons Management Company, at 23–24.

We have been unable to locate any cases involving exactly the same language as that contained in the present assignment clause. Nonetheless, we do not perceive its terminology as demonstrating an intent to prohibit the assignment of a claim for money damages. In our view, the critical language of the assignment provision for our purposes is its prohibition against the assignment of "[t]he *right* of HI...." A clause which "forbids only the assignment of a party's 'rights' under a contract simply does not preclude the assignment of an accrued claim for damages arising from its breach." *Cordis Corp. v. Sonics Int'l, Inc.,* 427 So.2d 782, 783 (Fla.App.1983). *See also Paley v. Cocoa Masonry, Inc.,* 433 So.2d 70, 70 (Fla.App.1983) (same).

**14.** *Accord Ford v. Robertson,* 739 S.W.2d 3, 5 (Tenn.App.1987); *Paley v. Cocoa Masonry, Inc.,* 433 So.2d 70, 70 (Fla.App.1983); *Cordis Corp. v. Sonics Int'l, Inc.,* 427 So.2d 782, 783 (Fla.App. 1983); *Grady v. Commers Interiors, Inc.,* 268 N.W.2d 823, 825 (S.D.1978).

**15.** While acknowledging the general rule, defendants contend that it does not apply to the present case. The claims related to the 1973 Agreement on which USI prevailed, defendants assert, were not for breach of contract. Rather the claims were for violations of Rule 10b–5 and for conspiracy to violate Rule 10b–5. Consequently, even if the assignment clause would not act to preclude the assignment of a cause of action for breach of contract, it must still operate to prevent the assignment of non-contractual choses in action.

We must admit to some confusion regarding defendants' argument. If the cause of action is non-contractual in nature, as defendants contend, then the contract's assignment clause can have no effect on whether the claim is assignable. If, on the other hand, the cause of action is essentially contractual in character, as USI contends, then we see no reason why the general rule should not apply.

Moreover, on a more fundamental level, we believe that defendants' purported distinction

must be rejected. While it is true that most of the cases considering whether an assignment clause will act to preclude a cause of action do so within the context of a suit for breach of contract, *but see Ford v. Robertson,* 739 S.W.2d 3 (Tenn.App.1987), we see no policy that would require us to apply a different rule for a claim arising out of a violation of federal securities laws. A traditional assignment clause, the cases suggest, acts to limit the right to assign rights and privileges relating to performance of the contract. It does not act to limit the right to recover damages arising from the contract. *See Ford,* 739 S.W.2d at 5 ("The law draws a distinction between the right to assign performance under a contract and the right to receive damages for its breach."). Whether the damages are contractual in nature, or arise from a federal statute, seems to us to be immaterial. So long as the assignment does not interfere with the parties' rights to performance, the assignment should be permitted. *See generally* 6 Am.Jur.2d § 33 (1963) ("Even though an executory contract may be nonassignable because of its personal nature, because of a provision therein for nonassignment, or for other reasons, after an event which gives rise to a liability on the contract, the reason for the rule disappears and the cause of action arising under the contract is assignable.").

Moreover, despite defendants' assertions to the contrary, we do not believe that the entire assignment provision on "the right of HI under and in connection with" can be read as requiring a different interpretation. In our view, that phrase, by defining the acts that fall within a party's right to performance, merely specifies the contractual right that cannot be assigned by HI; it does not show an intent to vary from the general rule allowing assignment of a right to damages.

Since the ability to assign a claim for damages is generally not prohibited by an assignment clause, we decline to read the phrase "the right ... under and in connection with" as altering a party's ability to assign a claim for money damages. *See, e.g., Rosecrans v. William S. Lozier, Inc.,* 142 F.2d 118, 124 (8th Cir.1944) ("The prohibition of the contract against assignment is against an assignment of *the rights and privileges under the contract.* The prohibition of an assignment does not, however, prohibit the assignment of a claim for damages on account of breach of the contract.") (emphasis added). *Accord Paley v. Cocoa Masonry, Inc.,* 433 So.2d 70, 71 (Fla.App.1983).

In sum, we conclude that the trial court was correct in its determination that the language of the 1973 Purchase Agreement did not act to prevent HI's assignment of its cause of action to USI.

### C. Credit for Settlements

The next issue, raised by Runyan, Peterson and Barlow, is whether the trial court erred in denying credit to the defendants for the full amounts received by USI in settlement from parties originally named as defendants.

■ Before trial USI and HI recovered at least $3.08 million in settlement from 21 parties to the litigation. When the defendants moved after trial to receive credit for the settlement amounts, however, the district court allowed them to set off only $544,719, representing the value of Schoonmaker's consulting services and the amounts allocated by USI to the FEA related claims.[16] The court said that USI's allocation of the various settlement amounts to the other claims

> [has] too many other variables that militate against credit. For example, credit should not be given for that amount allocated to the 1969 Exchange claims, since we do not know if plaintiff might have succeeded on those claims if defendants Robert Rice and Melby had been parties at the time of trial. In addition, no credit should be given to the amounts allocated to the non-FEA breach of fiduciary duty claims, the misappropriation of corporate opportunities claims, or the unallocated amounts, since it is not clear enough that the amounts were for injuries to plaintiff that went to the jury, e.g. whether the amounts were for HE or for some claim that never went to the jury.

36 R. 7354. As a result, the trial court declined to give the defendants full credit for the amounts received in settlement.[17]

On appeal, the defendants have mounted a two-pronged attack against the trial court's refusal to allow full credit for the settlement amounts: first, they object generally to the district court's analysis of the

---

**16.** When USI and HI settled with a defendant, the settlement amount was allocated among the various claims asserted against that defendant. *See* 35 R. 7204. The trial court accepted the allocations made by USI, concluding that they represented "the intent of the settling parties," and were "accurate." *See* 36 R. 7353.

**17.** Of course, credit would not normally be permitted for any award of damages based on a claim for which the defendants were not jointly and severally liable. *See Shapiro, Bernstein & Co. v. Goody,* 248 F.2d 260, 267 (2d Cir.1957), *cert. denied,* 355 U.S. 952, 78 S.Ct. 536, 2 L.Ed.2d 529 (1958); *Hill v. Budget Finance & Thrift Co.,* 383 S.W.2d 79, 81 (Tx.App.1964). Similarly, credit would not normally be allowed on an award of punitive damages. *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1387 (7th Cir.1984); *Ratner v. Sioux Natural Gas Corp.,* 719 F.2d 801, 804–05 (5th Cir.1983); *Hill,* 383 S.W.2d at 82. Consequently, the only damage awards implicated by the defendants' argument would be (1) the award of $69,281 arising out of the 1973 sale of FEK (the award of $614,000 as conspiracy damages and Rule 10b–5 damages less credit for $544,719); (2) the award of $45,000 relating to the HE venture; and (3) the award of $11,000 given in connection with CDC.

credit issue; and second, they question USI's allocation of the settlement amounts among the various claims.

Defendants' challenge to the trial court's analysis of the credit issue involves the use of a syllogism. First, the defendants characterize the plaintiff's case as "a giant single conspiracy within which many factors came together to produce the ... claimed single injury." Brief of Appellant George S. Peterson, Jr., at 26. Next, they note that under the "one satisfaction rule," a party may only recover once for an injury. Finally, for the conclusion, the defendants contend that since USI claimed only one injury, and since it may recover only once for that injury, any settlements made before trial were in satisfaction of that injury. Thus the settlements "should be credited to the trial [d]efendants also claimed to be a part of the overall conspiracy." *Id.* at 29.

■ Defendants' characterization of the "one satisfaction rule" cannot be disputed. It is a fundamental legal principle that an injured party is ordinarily entitled to only one satisfaction for each injury. *Harris v. Union Elec. Co.*, 846 F.2d 482, 485 (8th Cir.1988).[18] When a plaintiff receives an amount from a settling defendant, therefore, it is normally applied as a credit against the amount recovered by the plaintiff from a non-settling defendant, provided both the settlement and the judgment represent common damages. *Howard v. General Cable Corp.*, 674 F.2d 351, 358 (5th Cir.1982). *Accord Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492, 1508 (11th Cir.1985); *Ratner*, 719 F.2d at 803–04; *Harrington v. Texaco, Inc.*, 339 F.2d 814, 820 (5th Cir.1964), *cert. denied*, 381 U.S. 915, 85 S.Ct. 1538, 14 L.Ed.2d 435 (1965). *See also* Restatement (Second) of Torts § 885(3) and comments e and f (1977).

Nonetheless, we do not believe that the one satisfaction rule controls here. The purpose of the rule is to prevent a plaintiff from receiving double compensation for an injury. *Marcus, Stowell*, 797 F.2d at 233; *Howard*, 674 F.2d at 358. Consequently, the rule applies only where the defendants' conduct resulted in a single injury.[19]

■ By contrast, where two or more defendants are responsible for separate injuries, an amount received in settlement from one defendant for one of the injuries may not be used to reduce the liability of the other defendant for the other injury. *See, e.g., Hendrix*, 776 F.2d at 1509 (amount received by spouse who settled claim for loss of consortium should not be set off against damages received at trial because "the damages sustained by a spouse are exclusive of those suffered by her husband"); *Baughman v. Cooper–Jarrett, Inc.*, 391 F.Supp. 671 (W.D.Pa.1975), *aff'd in part, vacated in part on other grounds*, 530 F.2d 529 (3d Cir.1976) (where amount of settlement with one defendant included items of damage that were not part of judgment, non-settling defendant was entitled to credit only for the amount

---

18. *Accord Marcus, Stowell & Beye Gov't Sec., Inc. v. Jefferson Inv. Corp.*, 797 F.2d 227, 233 (5th Cir.1986); *Ratner v. Sioux Natural Gas Corp.*, 719 F.2d 801, 803 (5th Cir.1983); *Johnson v. Rogers*, 621 F.2d 300, 303 (8th Cir.1980); *Kassman v. American Univ.*, 546 F.2d 1029, 1033 (D.C.Cir.1976).

19. *See, e.g., Harris*, 846 F.2d at 485 ("*As long as plaintiffs have only suffered a single wrong*, they must be limited to a single recovery.") (emphasis added); *Howard*, 674 F.2d at 358 ("[A] non-settling defendant may *elect to* subtract the amount paid by settling defendants from a judgment entered against it *provided both the settlement and the judgment represent common damages*.") (emphasis added); *Schutt v. Allstate Ins. Co.*, 135 Ill.App.3d 136, 88 Ill.Dec. 329, 333, 478 N.E.2d 644, 648 (1985) ("Payments made by one of the joint tortfeasors on account of the tort either before or after judgment diminishes the claim of an injured person *against all others responsible for the same harm*.") (emphasis added); *Burke Enter., Inc. v. Mitchell*, 700 S.W.2d 789, 794 (Ky.1985) ("[W]here two or more persons *are potentially liable for a single indivisible harm*, a payment by or on behalf of any of them shall be a credit against the total amount due.") (emphasis added). *See also* Restatement (Second) of Torts § 885 comment e (1977) ("Payments made by one of the tortfeasors on account of the tort either before or after judgment, diminish the claim of an injured person *against all others responsible for the same harm*.") (emphasis added); *Mazanek v. Rockford Drop Forge Co.*, 98 Ill.App.3d 956, 54 Ill. Dec. 368, 374, 424 N.E.2d 1271, 1277 (1981) (same).

of settlement duplicated in the verdict); *Carr v. Cove*, 33 Cal.App.3d 851, 109 Cal. Rptr. 449 (1973) (where plaintiff sued two defendants for injuries sustained in separate automobile accidents occurring more than two months apart, non-settling defendant was not entitled to credit for the amount received by plaintiff in settlement with other defendant). The critical issue is whether the jury awarded damages to USI for a single indivisible injury, or whether the jury found that USI suffered separate and distinct injuries, some or all of which may have been uncompensated by the settlements.[20]

▮▮▮ We agree with the trial court that USI's cause of action cannot be correctly characterized as "a single case of a single injury." 36 R. 7353. Indeed, from our reading of the record, it seems clear that USI alleged two alternative theories of recovery. First, USI alleged a series of injuries arising from a single overriding conspiracy[21]; second, USI contended that it received several injuries as a result of a number of discrete individual acts and conspiracies. As the trial court noted in its Memorandum Opinion Regarding Entry of Judgment, "[i]t is true that plaintiff was primarily concerned with making out the existence of one large all-encompasing conspiracy throughout much of the litigation. It developed, however, that plaintiff was also pursuing the claims of a number of smaller conspiracies and individual violations of law." 36 R. 7353.

More importantly, the trial court did not charge the jury on USI's theory of a single conspiracy. Instead, the court expressly instructed the jury that the plaintiff had "alleged a number of separate conspiracies." 324 R. 16,969. "In this situation," the court continued,

> you are not to consider any acts or declarations against the defendant unless you find from a preponderance of the evidence that the person doing the act or making the declaration was a member of the same conspiracy as was that defendant.

*Reinfeld*, 229 F.2d 248, 252 (2d Cir.), *cert. denied sub nom.*, 352 U.S. 844, 77 S.Ct. 50, 1 L.Ed.2d 60 (1956), this court would not be required to apply the one satisfaction rule even if USI alleged only a single conspiracy. Rather, since USI has "consistently claimed that it suffered a series of injuries as a result of defendants' misconduct, whether that misconduct arose as a result of a single or of separate conspiracies," Reply Brief of Cross–Appellant U.S. Industries, at 18, the defendants should be denied any credit for amounts received by USI in settlement unless they can demonstrate that the settlement and the jury's damage award duplicated recovery for the same injury.

We cannot accept USI's argument. Participants in a conspiracy are jointly and severally liable for all damages resulting from the conspiracy. *Commercial Standard Ins. Co. v. Liberty Plan Co.*, 283 F.2d 893, 894 (10th Cir.1960). *See also Kashi v. Gratsos*, 790 F.2d 1050, 1054–55 (2d Cir.1986); *Beltz Travel Serv. Inc. v. International Air Transp. Assoc.*, 620 F.2d 1360, 1366–67 (9th Cir.1980). As a result, any allocation of a settlement among the different overt acts would make little sense; the defendant would be liable for all of the acts, and for all of the injuries arising from the acts. Any amounts received in settlement, therefore, would represent "common damages" with the judgment, entitling the non-settling tortfeasor to credit. *See Howard v. General Cable Corp.*, 674 F.2d 351, 358 (5th Cir.1982).

**20.** Defendants argue that the question "whether the jury eventually looked at a sub-conspiracy or one grand conspiracy" is irrelevant if, *"at the time the settlement agreements were executed, ... all of the defendants were viewed by USI/HI as being bound together as all encompassing co-conspirators and joint tortfeasors."* Reply Brief of Appellant George S. Peterson, Jr., at 14 (emphasis in original). We cannot agree. While defendants' argument may challenge the settlement allocations made by USI (and accepted by the trial court), it must be rejected as a ground for finding that the defendants are necessarily entitled to full credit for the settlements under the one satisfaction rule. The purpose of the one satisfaction rule is to ensure that a plaintiff does not recover double compensation for an injury. The critical focus, therefore, must be whether the jury award compensated the plaintiff for the same injury as the settlements.

**21.** USI argues in its reply brief that the question whether its theory of the case involved one giant conspiracy or a series of discrete conspiracies is a red herring. Any analysis of the credit issue, USI insists, must focus on the injuries instead of the claim. Because "[t]he damage for which recovery may be had in a civil action is not the conspiracy itself but the injury to the plaintiff produced by specific acts," *Hostrop v. Board of Junior College Dist. No. 515*, 523 F.2d 569, 576 (7th Cir.1975), *cert. denied*, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976), *citing Rutkin v.*

When the evidence distinctly shows, therefore, more than one conspiracy *which does not involve a particular defendant, then you cannot consider evidence of a separate conspiracy in which that defendant was not a party.*

324 R. 16,969. As a result, we believe that the jury must have perceived USI's claims as involving several conspiracies and individual violations rather than one all-encompasing conspiracy.

Finally, we believe that the form in which the case was sent to the jury effectively precluded it from finding that the plaintiff had suffered a single injury arising from one conspiracy. The special verdict forms divided USI's claims into a series of discrete conspiracies: the 1969 acquisition of HI by USI; the 1973 sale of FEK to HI; the Colorado Development Company transactions; and the creation and operation of HE. For each separate conspiracy, the jury was required to find the parties who had engaged in the conspiracy, the amount of damages suffered by USI arising from the conspiracy, and, if applicable, the misrepresentations or omissions that were committed in furtherance of the conspiracy. In light of the detail and specificity of the special verdict forms, therefore, the jury could have considered USI's grand conspiracy claim only by ignoring the forms themselves.

We cannot believe that the jury rejected the special verdict forms. In our view, it seems indisputable that the jury found that USI suffered several separate and distinct injuries rather than one single injury. As a result, the trial court did not err in refusing to give the defendants full credit for the amounts received in settlement.

This conclusion does not dispose of all the defendants' arguments. Defendants also contend that the trial court erred [22] in

accepting the allocations made by USI because they were "gerrymander[ed] ... to make them applicable to causes of action which had little likelihood of success...." *Id.* at 34. Defendants cite the facts that "Kenneth Melby allocated one dollar (out of settlement payments of nearly $709,-000.00) and Robert Rice allocated one dollar to the FEA claims out of a total settlement of nearly 1.4 million dollars." Brief of Appellant George S. Peterson, Jr., at 37–38. These unfair apportionments, the defendants conclude, are undeniable proof that USI "stack[ed] the deck" against the non-settling defendants, in "contraven[tion of] equity and public policy." *Id.* at 38.

■ We find the defendants' arguments unpersuasive. The defendants' examples of unfairness in the settlement allocations have been effectively refuted by USI. "While Robert Rice paid *USI* $1.00 in settlement of FEA-related claims," USI points out, "Rice also paid *HI* $150,000.00 in settlement of FEA-related claims." Brief of Appellee and Cross–Appellant U.S. Industries, at 68. USI explains that "under the present judgment Peterson has received credit for that [$150,000] sum." *Id.* at 69. Furthermore, USI justifies its allocation of the nominal sum of one dollar to Melby's settlement of the FEA claim on the grounds that "discovery failed to establish that Melby was a participant in FEA, and because Melby represented as a condition of his settlement that he was not involved with FEA." *Id.* *See also* Transcript of Hearing on July 13, 1983, at 70.

We agree that the allocations were fair.[23] Clearly, in dollar amounts the greatest potential liability to the settling defendants arose from the 1969 sale of Kennibec to USI. Thus, it seems reasonable that the greatest portion of the money received in

---

**22.** Because the defendants' claim implicates the ultimate factual questions whether the allocations of the settlement amounts were fair, and whether they represented the intent of the parties to the settlements, we apply the clearly erroneous standard. *See, e.g., Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

**23.** Because the settlement agreements are not part of the record on appeal, we have been unable to independently scrutinize them to determine their fairness. Rather, we have been forced to rely upon the hearing held by the trial court on the credit issue, the trial court's *Memorandum Opinion Regarding Entry of Judgment,* and the unchallenged assertions made by the parties in their briefs.

settlement would be allocated to the claims arising from that sale.

Finally, we note that the trial court accepted the allocations made between USI and the settling defendants only after "carefully review[ing] the memoranda in the file, the arguments presented on July 13, 1983, and its own knowledge of the litigation from its beginning...." 36 R. 7353. In light of the trial judge's intimate knowledge of the entire proceedings, we uphold his acceptance of the allocations. We are not "left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Thus, we hold that the trial court did not err in accepting the allocations among the various claims made between USI and the settling defendants, and we affirm the trial court's resolution of the credit issue.

### D. Resubmitting the Damage Awards

The fourth issue on appeal, raised by Runyan, is whether the trial court erred in resubmitting the question of damages to the jury. After the jury returned its verdict, the trial court noted that some of the damage awards appeared to be inconsistent with his instructions. In particular, although the jury was instructed by the court on joint and several liability, *see, e.g.*, 324 R. 16,970, and despite the fact that the verdict forms themselves required the jury to find identical damages for all of the defendants who were held liable on certain claims, *see, e.g.*, 33 R. 6745, the jury nonetheless returned different verdict amounts against defendants for claims on which they were jointly and severally liable. *See, e.g.*, 33 R. 6745; 33 R. 6751; 33 R. 6756; 33 R. 6762; 33 R. 6768; 33 R. 6774.

For example, with respect to USI's claim for breach of fiduciary duty arising out of the creation and operation of HE, the jury

assessed damages of $2500 against Leonard Rice and $5000 against Bond. At the same time, however, the jury also assessed damages of $30,000, $5000 and $2500 respectively against Runyan, Bond and Leonard Rice for the HE-related claim of *conspiracy* to breach a fiduciary duty. *See* 33 R. 6781–82; 33 R. 6786–87; 33 R. 6798–99. Since Runyan, Bond and Leonard Rice were jointly and severally liable for the HE-related fiduciary duty claims—regardless whether for breach or for conspiracy to breach—the jury's verdict seemed clearly to have been the result of confusion concerning joint and several liability. As a consequence, the court reinstructed the jury on joint and several liability, 329 R. 91–95, and submitted the following supplemental special verdict to them:

What amount do you find by clear and convincing evidence constitutes the total damages suffered by Health Industries as a result of the conspiracy to breach fiduciary duties that you have found in connection with each of the following, considered separately?

Financial Enterprises of America, Inc.

Health Equipment, Inc.

Colorado Development Company.

329 R. 99; 33 R. 6776. After a brief deliberation, the jury returned with its answer to the supplemental special verdict. The jury assessed the total damages caused by the conspiracies to breach fiduciary duties at $614,000 with respect to FEA, $45,000 with respect to HE, and $11,000 for CDC.

On appeal, Runyan argues that "the special verdict was complete and unambiguous on [its] face."[24] Appellant Runyan's Brief, at 3. Therefore, Runyan contends, the trial court should have accepted the jury's verdict, and the court's decision to resubmit some of the damages issues to the jury was an abuse of discretion.

■ We do not agree. Even a cursory examination of the special verdict forms conclusively demonstrates that the jury failed to properly apportion damages among defendants who were jointly and

---

**24.** Although Runyan defines this issue as whether "the Court err[ed] when it resubmitted the question of damages to the Jury," Appellant

Runyan's Brief, at 3, his specific claims of error are exclusively directed to the court's resubmission of the HE and CDC awards.

severally liable for the various fiduciary duty claims. Moreover, as a result of the jury's confusion, its award of damages was inconsistent with the court's instructions. Under such circumstances, we believe that "the trial court had the authority to request the jury to correct its verdict." *University Computing Co. v. Lykes–Youngstown Corp.,* 504 F.2d 518, 547 (5th Cir.1974).[25] Consequently, we hold that the trial court did not abuse its discretion when it resubmitted the fiduciary duty damage awards to the jury.

### E. Attorneys' Fees

*The Bad Faith Exception*

Touche claims that the district court erred in denying an award of attorneys' fees on the grounds that the record reveals that USI conducted the litigation in bad faith by wilfully making misrepresentations of fact and by intentionally shifting and disguising its contentions to circumvent the rulings of the district court. According to Touche, USI's conduct concealed from the court and Touche the plaintiff's intimate understanding of the accounting method which was the core of the plaintiff's claim. Touche concludes that this conduct was "tantamount to fraud on the judicial system", which imposed "extraordinary cost" upon Touche, and thereby justifies the award of attorneys' fees. Brief of Appellant Touche Ross & Co. at 23, 24.

There is no explicit contractual or statutory authorization for attorneys' fees for prevailing parties in litigation encompassing the issues in this suit. Touche urges that the proper use of the courts' discretionary power should result in an award for attorney fees.

An award for attorneys' fees is authorized by the court's inherent power to award fees in cases where the litigants' conduct constitutes bad faith as well as specific federal rules and statutes which provide discretionary power to the court for such awards. Specifically, Touche relies upon Fed.R.Civ.P. 56(g), authorizing the award of costs, including attorneys' fees, when affidavits are presented in bad faith or solely for the purpose of delay in conjunction with the filing of a motion for summary judgment; Fed.R.Civ.P. 11, authorizing the sanction of the reasonable costs incurred, including attorneys' fees, where a pleading, motion, or other paper is filed for any improper purpose, including one to harass or impose unnecessary delay or a needless increase in the cost of litigation; and 28 U.S.C. § 1927 (1982) which allows recovery against an attorney personally who multiplies the proceedings in any case unreasonably and vexatiously so as to make the attorney liable for the excess costs, expenses, and attorneys' fees reasonably incurred. Touche also contends that this appeal is frivolous and thereby warrants an award for damages and costs pursuant to Fed.R.App.P. 38 and 28 U.S.C. § 1912 (1982).

Touche argues that USI's conduct of this action constitutes bad faith and therefore qualifies as one of the narrowly defined exceptions to the American rule that parties pay their own counsel fees and other litigation expenses, absent statutory or contractual authority so providing.[26] *F.D. Rich Co., Inc. v. Industrial Lumber Co., Inc.,* 417 U.S. 116, 126, 129, 94 S.Ct. 2157,

---

**25.** *See also Dickerson v. Pritchard,* 706 F.2d 256, 259 (8th Cir.1983); *Rowe Int'l, Inc. v. JB Enter., Inc.,* 647 F.2d 830, 835 (8th Cir.1981); *Morrison v. Frito–Lay, Inc.,* 546 F.2d 154, 158–61 (5th Cir.1977); *Alston v. West,* 340 F.2d 856, 857–58 (7th Cir.1965); *Firemen's Ins. Co. v. Craigie,* 298 F.2d 457, 458 (8th Cir.1962); *Wells Truckways, Ltd. v. Burch,* 247 F.2d 194, 198 (10th Cir.1957). *Cf.* Fed.R.Civ.P. 49(b); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2513 (1971).

**26.** Another exception to the American rule arises when the court uses its equitable powers to make an award that operates to spread the counsels' fees proportionately among the members of an ascertainable class who have benefited from the plaintiff's successful litigation. *Hall v. Cole,* 412 U.S. 1, 5–6, 15, 93 S.Ct. 1943, 1946–47, 1951, 36 L.Ed.2d 702 (1973); *La Raza Unida v. Volpe,* 57 F.R.D. 94, 98–102 (N.D. Cal.1972), *aff'd* 488 F.2d 559 (9th Cir.1973), *cert. denied,* 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1138 (1974). Such an award for counsel who has acted as a "private attorney general" to effectuate a public policy does not require a threshhold finding of bad faith. This exception is inapplicable here.

2163, 2165, 40 L.Ed.2d 703 (1974); *Fleischmann Distilling Corporation v. Maier Brewing*, 386 U.S. 714, 717, 718, 87 S.Ct. 1404, 1406, 1407, 18 L.Ed.2d 475 (1967); *Lipsig v. National Student Marketing Corporation*, 663 F.2d 178, 180–81 (D.C. Cir.1980). "It is unquestioned that a federal court may award counsel fees to a successful party when his opponent has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Hall v. Cole*, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973).[27]

■ Awarding attorneys' fees under the bad faith exception is within the trial court's discretion and the ruling is reversed only for an abuse of that discretion. *Sterling Energy Limited v. Friendly National Bank*, 744 F.2d 1433, 1435–36 (10th Cir. 1984); *see Stewart v. RCA Corporation*, 790 F.2d 624, 633 (7th Cir.1986) (abuse of discretion standard for Rule 56(g)); *In re Hunt*, 754 F.2d 1290, 1294 (5th Cir.1985) (abuse of discretion standard for § 1927). Because an award of attorneys' fees under the bad faith exception is punitive, a court can impose the penalty "only in exceptional cases and for dominating reasons of justice." *Cornwall*, 654 F.2d at 687 (citing *United States v. Standard Oil Co.*, 603 F.2d 100, 103 (9th Cir.1979) and quoting 6 J. Moore, Federal Practice ¶ 54.77[2] at 1709–10 (2d ed. 1972)); *see also Sterling*, 744 F.2d at 1437; *Lipsig*, 663 F.2d at 180. The standard for bad faith awards is stringent, for "[o]therwise those with colorable, albeit novel, legal claims would be deterred from testing those claims in a federal court." *Sterling*, 744 F.2d at 1435 (quoting *Browning Debenture Holders' Committee v. DASA Corporation*, 560 F.2d 1078, 1088 (2d Cir.1977)); *accord Roadway Express*, 447 U.S. at 764, 100 S.Ct. at 2463 ("Because inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion.").

■ The defendant seeking fees must not only prevail on the merits, but must also "show plaintiff pursued the litigation in bad faith or brought a frivolous, unreasonable, or groundless action." *Autorama Corporation v. Stewart*, 802 F.2d 1284, 1287 (10th Cir.1986) (quoting *Glass v. Pfeffer*, 657 F.2d 252, 255 (10th Cir.1981); *Can–Am Petroleum v. Beck*, 331 F.2d 371, 374 (10th Cir.1964)).

■ Simply because the facts are found against a party "does not by itself prove that threshold of irresponsible conduct for which a penalty assessment would be justified." *Runyan v. McCrary*, 427 U.S. 160, 183, 96 S.Ct. 2586, 2601, 49 L.Ed.2d 415 (1976); *Autorama*, 802 F.2d at 1288; *Lipsig*, 663 F.2d at 181; *Can–Am Petroleum*, 331 F.2d at 374. A nonprevailing party should not be penalized for merely prosecuting or defending a lawsuit. *Rich*, 417 U.S. at 129, 94 S.Ct. at 2165; *Lipsig*, 663 F.2d at 181. However, assuming good faith in the filing of a claim or defense, a

---

**27.** In cases qualifying under this exception, "the underlying rationale of 'fee shifting' is punitive and the essential element in triggering the award of fees is therefore the existence of 'bad faith' on the part of the unsuccessful litigant." *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975) quoting *Rich*, 417 U.S. at 129, 94 S.Ct. at 2165; *accord Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980); *Hall*, 412 U.S. at 5, 93 S.Ct. at 1946. To impose the fee shifting sanction under any of the authorizations urged by Touche, a court must make the threshhold finding that the unsuccessful litigant has acted in bad faith. *Id.; Roadway Express*, 447 U.S. at 767, 100 S.Ct. at 2464; *Sterling Energy, Ltd. v. Friendly National Bank*, 744 F.2d 1433, 1437 (10th Cir.1984); *Cornwall v. Robinson*, 654 F.2d 685, 687 (10th Cir.1981); *see Schwarzer, Sanc-*tions *Under the New Federal Rule 11—A Closer Look*, 104 F.R.D. 181, 199 (1985).

When a court evaluates the conduct of parties and their attorneys in filing and conducting litigation, an objective standard applies. Under amended Rule 11, "subjective bad faith" is no longer required to trigger sanctions. *Burkhart Through Meeks v. Kinsley Bank*, 804 F.2d 588, 589 (10th Cir.1986); *Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir.1987) (rejecting subjective bad faith standard for imposing a sanction under the court's inherent power, 28 U.S.C. § 1927 or Fed.R.App.P. 38); *accord United States v. Associated Convalescent Enterprises, Inc.*, 766 F.2d 1342, 1347–48 (9th Cir.1985); *see also* Notes of Advisory Committee on 1983 Amendment to Rule 11. "The standard is one of reasonableness under the circumstances." *Id.; Braley*, 832 F.2d at 1512.

party can still be sanctioned for its misconduct in the conduct of the litigation. *Id.* at 182.

Touche having met the first prong of the test as a prevailing defendant, we initially consider whether the district court erred in refusing to find that the plaintiff conducted its prosecution of the suit in bad faith.

*The District Court's Denial of Attorneys' Fees*

The district court denied all claims for attorneys' fees of the plaintiff and the defendants. Earlier the court had issued a Memorandum Opinion Regarding Entry of Judgment. It also conducted a hearing on claims for attorneys' fees and costs. In the Judgment, Memorandum and transcript of the hearing the court articulated its views on the claims for fees.

Touche argues that after the first order of summary adjudication in 1981, USI conducted its litigation so as to circumvent that order and to keep alive its claims through the use of false declarations. According to Touche, an affidavit by USI Vice President, Singer and a declaration by USI's counsel, Mr. Rooker, were proven false at trial as were charges that Touche was responsible for false entries in accounting procedures.

With regard to false entries in the accounting records of HI/Kennibec, the record does not show that this issue was argued by USI in the manner in which Touche claims. The complaint and hearing record on Touche's motion for summary judgment on all claims reveals selective parsing by Touche on this issue. The colloquy between the court and the counsel for USI makes clear that the falsity or misrepresentation raised by USI was not derived from false information which was deliberately entered in the accounting records, e.g., a fact, figure or numerical statement with a prexisting verifiable or quantifiable quality which was falsely entered. A claim based on such false entries, with a promise of evidence to substantiate, was not used by USI to defeat Touche's motion for summary judgment. From that hearing record, we consider more than the narrow excerpt upon which Touche argues that to defeat its motion USI "invented the story that false entries did exist." Brief of Appellant Touche Ross. The context of the plaintiff's claims, as discussed in the hearing on Touche's second motion for summary judgment, must be considered.

At the hearing on September 7, 1982 the court was unambiguously concerned that, as with any accounting method, the one at issue in this action appropriately reflect the allocation of income and costs. 239 R. 80–81. USI's counsel stated its claim: the accounting method and its application "underestimate the future expense and overestimate the current revenue." *Id.* at 81. The court replied, "All right. That's the kind of thing I'm trying to get at." *Id.* Thereafter occurred the exchange upon which Touche relies:

> The Court: Do you have evidence that those records were false?
>
> Mr. Rooker: Yes.
>
> The Court: In that they did not represent the actual cost that would be incurred in servicing a particular contract and arriving at an income?
>
> Mr. Rooker: Yes. We will have expert testimony to that effect.

*Id.* at 82. This particular exchange did not conclude the matter nor direct the discussion toward what the court characterized as "figures [which] were false." *Id.*

In the continuing discussion USI's counsel asserted that Touche failed to audit the HI/Kennibec management estimates and allocation of current income and the costs of future services used for the accounting records. *Id.* at 82–84. According to USI, the failure to audit the allocations underlying the accounting records made them misleading. *Id.* at 85. At this time the court further identified the nature of USI's claim:

> The Court: Is that part of the allegation of facts you have in your complaint against Touche is that they have falsified with respect to certified audit?
>
> Mr. Rooker: Yes. We have not gone into the detail with respect to the allocation of the cost. That is, however, in our statement of claims against them.
>
> The Court: Okay.

*Id.* at 85. The discussion on this issue was then concluded.

The court's inquiry and USI's responses distinguish the nature of the court's and the plaintiff's focus from that directed to a deliberate falsification of facts or figures. The court was properly concerned with the result of the accounting method used to prepare the accounting records at issue. In the partial summary judgment previously granted to Touche, the court had reserved this issue for the jury, to be considered in the context of the facts and circumstances surrounding the parties' transactions. Touche has misconstrued the claim raised in the complaint and at the hearing on the motion for summary judgment. The narrow slice of hearing colloquy, *supra,* does not support a finding that USI made a false accusation which constitutes bad faith.

Of concern here is the charge that the two affiants used by USI made "blatant misrepresentations" of fact to the court. Brief for Appellant Touche Ross, at 27–28; Consolidated Brief for Touche Ross, at 41–43. Touche claims that the "first untruth" was Rooker's claim that USI was not aware of the use or effects of the front-end method. Brief for Appellant Touche Ross at 28. The second misrepresentation was Singer's statement that USI was unaware of the methods by which the costs of future services were determined. *Id.* Each of these misrepresentations, Touche contends, had a significant part in persuading the district court that USI should proceed to a trial on its claims. *Id.* As Touche interprets the evidence at trial, the falsity of these two declarations was conclusively established through the testimony of Messrs. Kuscsik and Wright, former USI officials. If such falsity was intentionally inflicted upon the court and it were so established in the trial record, then a sanction would be appropriate. This would be derived not just from Rule 56(g) which focuses on affidavits presented in bad faith or solely to cause delay, but also from Rule 11, § 1927, and the court's inherent power to punish those who abuse the judicial process.

In its memorandum regarding other defendants' claims for attorneys' fees in connection with claims for which the jury found no liability, the court stated:

> [T]he court is of the opinion that plaintiff's claims did not border on the frivolous and, consequently, it would be inappropriate to award attorneys' fees. Plaintiff's unsuccessful claims survived numerous motions for summary judgment and for directed verdicts before failing with the jury.

36 R. 7351. Subsequently, in the proceeding to hear Touche's claims for attorneys fees, based on the grounds previously stated, the court acknowledged that there was "much confusion" in the plaintiff's articulation and pursuit of its case. Transcript for December 2, 1983, at 52. After consideration of Touche's argument, the court concluded:

> And it is my considered judgment that the case was fairly tried; that there was an issue to present to the jury; that the defendants were not put upon in terms of there being a legitimate cause to be presented so far as plaintiffs were concerned. And there is no justification, under these circumstances to award attorney's fees. So that attorney's fees are denied.

*Id.*

The court's ruling was made after the judge conducted the trial; heard the disputed declarations and the testimony which contradicted or differed; and considered the Touche memorandum and arguments for the award. We are not persuaded that the court improperly denied the award of attorneys' fees as there is no convincing proof that the plaintiff vexatiously pursued its suit through misconduct which included falsified declarations. Touche's claims of false or deliberate misrepresentations were not established by unchallenged testimony or evidence offered by Touche's witnesses, Kuscsik and Wright, and other parts of the trial record do not demonstrate intentional misconduct

by USI.[28]

"Clearly, courts are quite hesitant to find claims were pursued in bad faith unless the evidence is remarkably supportive of such a proposition." *Autorama,* 802 F.2d at 1287, 1288. Here, the district court did not find that bad faith was shown. There were sufficient legal claims, all of which survived Touche's two motions for summary judgment, and disputed material facts which warranted a trial and determinations by a jury. Our review fails to show that the judge erred in refusing to allow fees under § 1927 or under Rules 11 and 56(g), or the bad faith exception to the American rule. *Stewart,* 790 F.2d at 632, (citing *Wisconsin Real Estate Investment Trust v. Weinstein,* 781 F.2d 589, 597 (7th Cir.1986), and *In re TCI Ltd.,* 769 F.2d 441, 448 (7th Cir.1985); *Autorama,* 802 F.2d at 1287, 1288).

Touche also requests an award of the attorneys' fees necessitated by USI's appeal of the district court judgment. Rule 38, Fed.R.App.P. Insofar as Touche is a prevailing party whose district court judgment is affirmed by this court, Touche also asks for damages for delay under 28 U.S.C. § 1912. Both Rule 38 and § 1912 allow for single or double damages if the court determines that an appeal is frivolous or brought for purposes of delay. *Clark v. Commissioner of Internal Revenue,* 744 F.2d 1447, 1448 (10th Cir.1984).

To warrant an award of attorneys' fees arising from an appeal the movant must be the prevailing party and must show that the appeal was undertaken in bad faith or as a frivolous, unreasonable, or groundless action. *Autorama,* 802 F.2d at 1287. "An appeal is termed frivolous if the result is obvious, or the arguments of error are wholly without merit." *Id.* (citing *DeWitt v. Western Pacific R.R. Co.,* 719 F.2d 1448, 1451 (9th Cir.1983)); *Braley,* 832 F.2d at 1510; *McConnell v. Critchlow,* 661 F.2d 116, 118 (9th Cir.1981). As with the district court awards for bad faith, the attorney's conduct is evaluated by an objective standard and "fees are imposable against an attorney personally for conduct that, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court." *Braley,* 832 F.2d at 1512.

■ Here USI's appeal did not lack any legal or factual basis, but instead "contained legitimate disputes whose outcomes reasonable persons could differ upon." *Autorama,* 802 F.2d at 1288. The mere failure of USI to prevail at trial does not necessarily imply that its conduct in appealing was vexatious or that the grounds for appeal were wholly unreasonable and without proper foundation. *Id.; Overnite Transportation Co. v. Chicago Industrial Tire Co.,* 697 F.2d 789, 795 (7th Cir.1983); *accord Lipsig,* 663 F.2d at 181; *Can–Am Petroleum,* 331 F.2d at 374. The record

---

**28.** Kuscsik and Wright presented testimony supportive of Touche's contention that USI had full knowledge of the front-end accounting method being used and its contemporaneous and future consequences. This knowledge, as Touche argued, came directly from the independent auditor, Ernst and Whinney, employed by USI for one period. However, on this communication between Ernst and USI, USI's witnesses contradicted the testimony of Kuscsik and Wright. Moreover, their testimony was offered without proof of one key factual contention, that Ernst sent and USI received the letter in which Ernst allegedly informed USI about the front-end method and the concerns Ernst had about its use. *See e.g.,* 309 R. 13301–13303, 13519–13527 (Kuscsik testimony); 253 R. 714–24 (Singer testimony). Touche's contention that *the letter* was "destroyed at USI's explicit or implicit request" for the purpose of "suppressing the evidence of its knowledge" cannot convert an evi-

dentiary dispute into an uncontroverted basis for a charge of misconduct by USI. Consolidated Brief of Appellant at 43. *See Dreiling v. Peugeot Motors of America, Inc.,* 768 F.2d 1159 at 1166 (10th Cir.1985) (weighted evidentiary matter does not suffice to establish opposing party's participation in a conspiracy).

The record reveals an evidentiary dispute properly handled by the court rather than an instance which establishes what Touche characterizes as "overwhelming" evidence of false statements perpetrated by USI on the court. The absence of a copy of the disputed letter informing USI about the front-end method, its impact and shortcomings; the inconclusive testimony about the letter's existence and other communication informing USI; and the credibility of the sparring witnesses *created an issue of fact* for the jury. Since Touche was not found liable by the jury, it resolved the issue in Touche's favor.

and the arguments made fail to convince us that the standards for awards under Rule 38 or § 1912 have been met.

Accordingly, we hold that an award of attorneys' fees pursuant to Rule 38 and for damages pursuant to 28 U.S.C. § 1912 should be denied.

## F. Costs

*28 U.S.C. § 1920 and the Standard of Review*

Touche seeks the award of certain costs denied by the district court and urges that these costs qualify for remuneration under 28 U.S.C. § 1920. According to Touche, costs for document discovery and reproduction and computerized analysis of documents produced in the case should be awarded under the terms of § 1920(4) providing reimbursement for "[f]ees for exemplification and copies of papers necessarily obtained for use in the case." Touche says that the cost of daily transcript similarly qualifies under § 1920(2) covering reimbursement "for all or any part of the stenographic transcript necessarily obtained for use in the case." The amounts requested are: $93,000.00 for document discovery and reproduction; $247,000.00 expended for computerized document analysis; and $26,000.00 for the daily trial transcript.

■■■ Touche invokes the court's discretionary power to authorize the award of these costs. The "discretion given district judges to tax costs should be sparingly exercised with reference to expenses not specifically allowed by statute." *Farmer v. Arabian American Oil Co.*, 379 U.S. 227, 235, 85 S.Ct. 411, 416, 13 L.Ed.2d 248 (1964). For purposes of judicial review, "[T]he taxing of costs rests in the sound judicial discretion of the trial court, and the exercise of such discretion will not be disturbed on appeal except in case of abuse." *Rosenfield v. Kay Jewelry Stores, Inc.*, 400 F.2d 89, 90 (10th Cir.1968) (*quoting State of Utah v. United States*, 304 F.2d 23, 27 (10th Cir.1962)). While a finding that some or all of the costs requested are statutorily authorized creates a Rule 54(d) presumption favoring their award, the court retains broad discretion to disallow any nonstatutory cost items on the bill of the prevailing party which seem excessive under the circumstances. *Sun Ship, Inc. v. Lehman*, 655 F.2d 1311, 1318, 1319 (D.C. Cir.1981); *see Serna v. Manzano*, 616 F.2d 1165, 1167–68 (10th Cir.1980) (district court should state why costs are disallowed so appellate court can judge if trial court acted within proper confines of its discretion).

■■■ The court's exercise of its discretionary power turns on whether or not the costs are for materials necessarily obtained for use in the case. This is an issue of fact to be determined by the district judge based on either the existing record or the record supplemented by additional proof. *Sun Ship*, 655 F.2d at 1317; *Mikel v. Kerr*, 499 F.2d 1178, 1182–83 (10th Cir.1974). In the court's determination, "[i]tems proposed by winning parties as costs should always be given careful scrutiny." *Farmer*, 379 U.S. at 235, 85 S.Ct. at 416. Even if the court finds the costs were for materials or services necessarily obtained, the amount of the award requested must be reasonable. *United States v. Blodgett*, 709 F.2d 608, 610, 611 (9th Cir.1983); *Wehr v. Burroughs Corporation*, 619 F.2d 276, 285 (3rd Cir.1980); *see also Farmer*, 379 U.S. at 235, 85 S.Ct. at 416 (district court does not have unrestrained discretion to tax costs to reimburse a winning litigant for every expense he incurred in the conduct of his case).

"Necessarily obtained" does not mean that the materials and services obtained "added to the convenience of counsel ... and perhaps ... have made the task of the trial judges easier." *Farmer*, 379 U.S. at 234, 85 S.Ct. at 415; *Brumley Estate v. Iowa Beef Processors, Inc.*, 704 F.2d 1362, 1363 (5th Cir.1983) (costs of daily transcript denied where convenient for counsel, but not required for use in the trial); *Galella v. Onassis*, 487 F.2d 986, 999 (2d Cir.1973) (necessity, beyond mere convenience of counsel, must be shown to recover costs of daily transcript); *Frigiquip Corporation v. Parker–Hannifin Corporation*, 75 F.R. D. 605, 614 (W.D.Okla.1977) (citations omit-

ted). The most direct evidence of "necessity" is the actual use of materials obtained by counsel or by the court. *E.g., Mikel v. Kerr*, 499 F.2d at 1183; *A.B.C. Packard, Inc. v. General Motors Corporation*, 275 F.2d 63, 74–76 (9th Cir.1960); *Marcoin, Inc. v. Edwin K. Williams & Co., Inc.*, 88 F.R.D. 588, 590 (E.D.Va.1980); *see generally* Bartell, *Taxation of Costs and Awards of Expenses in Federal Court*, 101 F.R.D. 553, 567–75 (1984). Though use at trial by counsel or the court readily demonstrates necessity, if materials or services are reasonably necessary for use in the case even though not used at trial, the court can find necessity and award the recovery of costs. *Wahl v. Carrier Manufacturing Co., Inc.*, 511 F.2d 209, 217 (7th Cir.1975).

*Document Discovery, Reproduction, and Computer Analysis*

We consider the document discovery and reproduction claims with the related cost for computerized document analysis. Touche contends that it was forced to expend substantial resources for these costs because it was named as defendant some four years after filing of the complaint, thereby necessitating immediate expenditures to "become current" in the case, and because of the undifferentiated and massive manner in which USI produced documents. Brief of Appellant Touche Ross at 20–21. In Touche's account of discovery, USI responded by producing hundreds of thousands of undifferentiated documents located in storage facilities throughout the country. *Id.* To manage the analysis of these documents, Touche microfilmed selected documents which were analyzed and then entered them in a computerized reference system. This task involved $93,000.00 in costs to review, sort, and microfilm the documents and $247,-

848.00 for the services of a professional information management consultant to design, establish and maintain the computerized data base.

 The primary issue concerning these claimed costs is whether they were necessarily incurred in the litigation. The timing of when Touche entered the case is not dispositive as any litigant must satisfy the "necessarily incurred" standard. 28 U.S.C. §§ 1920 and 1924. If costs are granted, any amount allowed must be reasonable. Touche was named as a defendant in 1979 and trial commenced on November 15, 1982. There is no exigency demonstrated which would in and of itself justify granting what Touche calls "extraordinary" expenses for discovery and preparation for trial.

After the court heard the basis for Touche's request for the award of these extraordinary costs, it concluded that in accordance with the guidelines from *Farmer*, these costs should not be granted. The court pointed to the Supreme Court's direction that the prevailing party's requests for costs should be given careful scrutiny and the court should sparingly exercise its discretion with regard to expenses not specifically allowed by statute. Transcript for Hearing on Attorneys' Fees and Costs, December 2, 1983, 33; *Farmer*, 379 U.S. at 235, 85 S.Ct. at 416. The court acknowledged its discretionary power as stated in *Farmer*, but stated that it should be used in "special circumstances". Transcript, at 33. Finding the absence of such special circumstances, the court held that while the basis argued by Touche might be the "wave of the future" the costs sought by Touche were not justifiable. *Id.* at 34.[29]

---

**29.** Where a sufficient showing of necessity is made, the courts have held that unusual or nonstautory costs should be granted. *E.g., Commonwealth of Pennsylvania v. O'Neill*, 431 F.Supp. 700, 716 (E.D.Pa.1977) *aff'd*, 573 F.2d 1301 (3rd 1978) (computer programming services and analysis "were both essential to the establishment of the plaintiffs' case, and invaluable to the Court's fact-finding process"); *A.B.C. Packard*, 275 F.2d at 74, 75 n. 14 (costs awarded where daily transcript was necessary for the use of the court); *Marcoin*, 88 F.R.D. at 590 (daily

transcript found necessarily obtained as it was used by the counsel and by the court for its rulings); *Frigiquip*, 75 F.R.D. at 614 (research and analysis costs granted where resulting report was introduced into evidence).

We do not find any grounds similarly persuasive as those in *Pennsylvania v. O'Neill* so as to grant the computer related costs in this case. Here the court's discretionary power should be sparingly applied so as to deny these particular costs. *Roberts v. Charter National Life Insurance Co.*, 112 F.R.D. 411, 413 (S.D.Fla.1986)

We feel that the district court did not use an inappropriate standard nor did it abuse its broad discretion in disallowing the nonstatutory costs sought by Touche.

*Daily Transcript Cost*

Touche seeks the cost of daily transcripts in the amount of $26,000.00, asserting that Touche and USI had a pretrial agreement to share this cost as well as claiming that this expense qualifies under § 1920(2) providing fees "for all or any part of the stenographic transcript necessarily obtained for use in the case."

We consider first the claim that these two parties had a pretrial agreement to share the cost of daily transcript. This court was not provided with any written copy of such an agreement. Hence, we assume any such agreement must have been oral. In the December 2, 1983 hearing on attorneys' fees and costs the district court addressed the issue of daily transcript costs. *See* Transcript for December 2, 1983, 19–25, 75–78, 86–87. That proceeding does not demonstrate the existence of a pretrial agreement between Touche and USI which would control the allowance of the premium for daily copy being imposed by the court as costs.[30]

In the December 2, 1983 hearing counsel for Touche argued in favor of the allowance of Touche's half of the premium paid for daily copy. He explained:

> That when it was pointed out by the court reporter that it would be impossible to provide transcripts, daily transcripts at the rate which is set forth in judicial conference order, both counsel for Touche and counsel for USI conferred and agreed that they would be

desirous of a daily transcript and were prepared to pay the additional cost. (12/2/83 transcript at 19).

The same counsel for Touche further stated:

> And then the parties agree[d] that they will allocate the cost between each other and we paid it every week or every 2 weeks. To then come in and say, well, there was something more you should have done.

Touche relies on the agreement asserted as establishing the necessity of the daily transcript and therefore its allowance under the statutes and rules. The briefs for USI do not discuss the asserted agreement nor deny such discussions. Nevertheless we find no error in the ruling of the district judge denying the allowance of the special costs of daily transcripts. The statements of counsel for Touche respecting an "agreement" merely show that when the practical problem of contemporaneous payment of the court reporter arose, counsel for Touche and USI conferred and agreed they were desirous of the daily transcript and apparently they allocated the costs and paid it every week or every two weeks. The arrangement is some evidence of the necessity of the daily transcript, but not conclusive on the trial judge in awarding costs under the statute and rules.

The judge then inquired why the court was not asked, prior to trial, to approve the special expense of daily transcripts. *Id.* at 19. Touche's counsel replied that having reached agreement with USI's counsel, Touche did not expect to face a challenge as to this premium cost. The court then reminded counsel that "even if the agreement is without objection, and it is not, it is agreed. Nonetheless, all I can do is to

---

(though broader language of other statutes allows computerized research costs, under § 1920 they should be denied; also cites J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* ¶ 54.77[8] (2d ed. 1986) for view that computer research is generally treated as a lawyer's cost and not taxable as ordinary costs); *see also Friedlander v. Nims*, 583 F.Supp. 1087, 1089 (N.D.Ga.1984); *Fressell v. AT & T Technologies, Inc.*, 103 F.R.D. 111, 113–15 (N.D.Ga.1984); *Guinasso v. Pacific First Federal Savings and Loan Association*, 100 F.R.D. 264, 265 (D.Ore. 1983); *but see Wehr*, 619 F.2d at 285; *O'Donnell*

*v. Georgia Osteopathic Hospital, Inc.*, 99 F.R.D. 578 (N.D.Ga.1983) (O'Donnell rational rejected by *Friedlander* and *Fressell, supra*).

**30.** In that hearing other defendants, Leonard and Brent Rise, John Runyan, and James Barlow clearly stated that they had not entered into any such pretrial agreement. Transcript for December 2, 1983, 21, 75–78, 86–87. The counsel for Touche agreed with these defendants on the nonexistence of an agreement with them. *Id.* at 21.

determine whether, under the rule of law, it is awardable." *Id.* at 20. Ultimately, the court awarded only the regular price of transcript and denied the premium difference which Touche requested.

■ From our examination of the briefs and the record, and the reasons stated by the trial judge, we find no abuse of discretion or error by the trial court in denying these special costs. Under § 1920(2), to award this premium cost for daily production, a court must find that daily copy was necessarily obtained, as judged at the time of transcription. *Sun Ship,* 655 F.2d at 1318; *see generally Bartell,* 101 F.R.D. at 571–73. Neither the record nor the proceedings of December 3, 1983 reveal that the daily transcript was necessary for either counsels' use at trial or for the court's handling of the case. *E.g., Galella,* 487 F.2d at 999; *A.B.C. Packard,* 275 F.2d at 74, 75 n. 14; *Marcoin,* 88 F.R.D. at 590.

The failure to obtain court approval of a special expense prior to trial also argues against granting the daily rate of transcription. *See Bartell,* 101 F.R.D. at 571–72; *Brumley Estate,* 704 F.2d at 1363. The district court properly focused on the lack of pretrial approval and whether convenience to Touche's counsel was the primary benefit, rather than a matter of necessity. Transcript for December 2, 1983, 20. If the issues in this case were so complex as to justify overlooking the lack of pretrial approval, a court could have used its discretion to award the cost where the daily copy proved invaluable to *both* the counsel *and* the court. *See Farmer,* 379 U.S. at 234, 85 S.Ct. at 415; *Bartell,* 101 F.R.D. at 572–73.

The district court properly scrutinized the claims of Touche for the daily transcription costs. The court was in the best position to assess the value of the daily copy. The decision to deny this cost was reached using the appropriate guidance from *Farmer* and its progeny on how the

court should use its discretionary power. There was no abuse of discretion in the district court's decision to deny the cost of daily transcription.

## G. The Grant of Partial Summary Judgment

The first claim of error advanced by USI is that the trial judge improperly granted Touche's motion for partial summary judgment when he ruled that USI's claims against Touche relating to the allegedly fraudulent use of the front-end method of accounting were barred by the applicable statutes of limitations.[31]

In granting the motion, the trial court determined that under Utah law, USI's claims of fraud against Touche began running on the date when USI *"should have known* of the alleged fraud." 8 R. 1568 (emphasis in original). "After a careful review of the documents and papers submitted in connection with this motion," the court continued, "plaintiffs should have known of the effect the front-end method had on the purchase price of HI stock by at least October 17, 1975." 8 R. 1568. Because Utah's fraud statute had a three year limitations period, and because Touche was not named as a defendant until October 12, 1979—almost four years after the time the statute of limitations began running—the court concluded that USI's claims based on the front-end accounting method were time barred.

On appeal, USI has mounted a full scale attack on the trial court's grant of partial summary judgment. First, USI argues that the trial court "improperly resolved disputed issues of fact in concluding that USI should have discovered Touche's fraud by 1975." Brief of Appellee and Cross–Appellant U.S. Industries, at 18. Second, USI asserts that the trial court erred in concluding that under Utah law the statute of limitations began running when USI "should have discovered" Touche's fraud. Rather, USI contends, "the statute begins

---

**31.** The trial court found that USI's claims against Touche for breach of fiduciary duty, negligence and breach of contract were also barred by statutes of limitations. USI's arguments on appeal, however, focus exclusively on the trial court's ruling that the fraud claims were time barred. Consequently, we do not address the trial court's determination that the other claims were likewise barred.

to run at the time the plaintiff actually discovers the facts constituting the fraud." *Id.* at 25. Third, USI alleges that even if the trial court properly interpreted the "discovery" rule, it misapplied the rule in the present case. Finally, USI argues that if the trial court was correct in concluding that the statute of limitations began running on October 17, 1975, the statute should have been tolled.

■ We need not decide the issues raised by USI. We are convinced that any error that may have been made by the trial court when it granted Touche's motion for partial summary judgment was cured by its subsequent "clarification" of the ruling. On September 20, 1982, at the same time the trial court denied Touche's Motions for Summary Judgment and Summary Adjudication, the court also addressed a motion by USI "to reconsider the ruling contained in the Order dated August 21, 1981, granting partial summary adjudication with respect to USI's claims against defendant Touche insofar as such claims relate to Touche's use and approval of the front-end method of revenue recognition." 15 R. 3129. "After considering the new arguments presented" by USI, the trial court concluded that it was "appropriate to reconsider the order for purposes of clarification." 18 R. 3804. The Order Granting Interlocutory Summary Adjudication in Favor of Touche, the court emphasized, had been severely limited in its original scope. It was not intended to preclude "the introduction of evidence relating to the 'front-end' method where that method was introduced with other admissible evidence to establish Touche's fraud." 18 R. 3804. Rather it was designed only to prevent USI "from asserting that the 'front-end' method was a fraudulent device *in and of itself.*" 18 R. 3804 (emphasis added).

The narrow scope of the court's ruling—that the grant of partial summary judgment only prevented USI from asserting that the front-end method was per se fraudulent—was reinforced by statements made from the bench during the course of the trial. At one point, the court told the jury that "the use of what's called the front end method of accounting ... [is] not *per se illegal or improper.*" 261 R. 2288 (emphasis added). In a similar vein, the trial court later stated, in response to a juror's question whether the front-end method was a generally accepted accounting practice, that "in 1969 the front end method ... was an approved method legally to use. The issue here is whether or not it was properly applied fairly, fairly applied and so on." 266 R. 3282.

Despite the trial court's modification of its original grant of partial summary judgment, however, USI nonetheless contends that it was unjustly hampered by the court's ruling. The court's resolution of the partial summary judgment motion, USI argues, prevented it from attempting to prove that the front-end method "was inherently improper for use in the health spa industry." Reply Brief of Cross–Appellant U.S. Industries, at 4. As a consequence, USI contends, "the jury was forced to deny USI's claims against Touche." *Id.* at 5.

■ We do not agree. In our opinion, the trial court's ruling, fairly read, merely prevented USI from arguing to the jury that the front-end method of accounting was always fraudulent. It did not in any way prohibit the jury from concluding that the method was inappropriate either for use in auditing Kennibec, or for use in the health spa industry generally. Insofar as the ruling prevented an assertion by USI that the front-end method was itself fraudulent, any error was harmless because USI's evidence showed that the method itself followed generally accepted accounting principles.[32]

In fact, in our view USI was allowed to develop the claim that the front-end method was inappropriate for use in the health spa industry. This appears to be a consistent thread running throughout the trial. During the entire trial, USI hammered home the facts that Touche initially recom-

---

**32.** USI's own experts testified that the front-end method followed generally accepted accounting principles, *see, e.g.,* 261 R. 2372–73 (testimony of Soloman); 263 R. 2876–77 (testimony of Liddell).

mended the use of a deferred accounting method in auditing health spas; that Touche suddenly shifted to the front-end method in 1969; and that Touche returned to the original deferred method in 1974. The obvious inference that USI sought to draw from these changes, it seems clear, was that the front-end method was not a proper method to use for audits of the health club industry. Similarly, throughout the trial, USI strongly stressed a number of Touche's internal memoranda recommending that the deferred accounting method be used in recognizing income for health clubs. *See e.g.,* 263 R. 2808–70. Again, the suggestion is clear and unavoidable that the deferred method proposed by these memoranda—rather than the front-end method—was the appropriate accounting method to use.

Moreover, a careful reading of the record demonstrates that USI explicitly argued that the front-end method was an improper accounting method for the health spa industry. In its opening statement to the jury, for instance, USI stated that "Touche devised ... an accounting method that, *because of the particular nature of [HI's] business and operations* and because of the manner in which the method was applied, *it did not fairly present Health's financial condition* and the results of its operations in the financial sense." 249 R. 150 (emphasis added). *See also* 249 R. 152–53. Likewise, in its closing argument, USI at least indirectly argued that the

front-end method was a deceptive accounting method to use in recognizing income for health spas.[33]

We conclude that USI was not prevented from arguing that the front-end method of accounting was inherently improper for use in the health club industry. Any error made by the trial court in its initial grant of partial summary judgment in favor of Touche was cured by its subsequent modification of the order and was harmless in any event.

## H. Limiting the Conspiracy Claims to Trial Defendants

The second error claimed by USI on appeal arises from the trial court's instructions to the jury that the defendants could be found liable on the conspiracy and aiding and abetting claims arising from the 1969 sale of Kennibec to USI only if the jury found that the defendants had conspired with, or aided and abetted, other named defendants.[34] *See, e.g.,* 324 R. 16,-951–55 (Aiding and Abetting Instructions); 324 R. 16,955–69 (Conspiracy Instructions). *See also* 324 R. 16,903; 324 R. 16,906. *But see* 324 R. 16,910. These instructions, USI argues, both prevented the jury from finding a conspiracy among a trial defendant and the settling defendants, and precluded a finding by the jury that a trial defendant had aided and abetted a settling defendant.

**33.** USI argued:
> You have heard from many witnesses that the cash basis of accounting is not in accordance with generally accepted accounting principles.... Why is it not? Because it does not properly accomplish a matching of revenues and expenses, time when you get the revenues and time when you have to spend the money to cover the expenses.
> What method do you use, then?
> You use an accrual method.
> ... [A]nd what we have in this earning comparison, Plaintiff's Exhibit 3963, is a representation of two different accrual methods. They are both accrual methods. Neither one of them is a cash method, or one of them is awfully close to a cash method. One that is awfully close to a cash method is this [front-end] method.
> Now, you might ask ... why [the cash method] so closely matches the pretax profits

> utilizing the front-end method and doesn't match the pretax profits at all utilizing the [deferred] method. And I suspect that you all know the answer to that. The answer is if you are only deferring 10 percent of your revenue or 12 percent of your revenue that there is so little difference between the cash method recognizing all of your contract sales and the method that they were using that you would expect them to track very closely.
> 324 R. 17091–93.

**34.** USI's claim of error is actually directed at two separate transactions—the 1969 sale of Kennibec to USI, and the Banyan Tree Plaza project. However, we believe that essentially the same issues are implicated in both transactions. Consequently, although we confine our discussion to the 1969 transaction, our analysis applies to the Banyan Tree Plaza project as well.

Moreover, USI says that this error in the instructions was compounded by the special verdict forms submitted to the jury. In the event a defendant was found liable for conspiracy or aiding and abetting, USI notes, the jury was required on the special verdict forms to specify the individuals or business entities with whom the wrongdoer had conspired or aided and abetted. Unfortunately, however, the list of potential co-conspirators was limited on the special verdict forms to the trial defendants. *See, e.g.,* 22 R. 6697; 33 R. 6704; 33 R. 6710–11; 33 R. 6718; 33 R. 6725; 33 R. 6732. As a result, the jury was effectively prevented from finding that the wrongdoer had conspired with, or aided and abetted, anyone other than the trial defendants.

The trial court's refusal to instruct the jury that it could find a conspiracy between a trial defendant and a settling defendant, USI argues, was particularly prejudicial in light of the fact that three of the settling defendants—Robert Rice, Kenneth Melby and Raymond Wilson—were major architects of the 1969 fraud. Based on the evidence, USI insists, the jury could easily have concluded that some of the settling defendants had conspired with one of the trial defendants to defraud USI in the 1969 sale of Kennibec to USI. Because the jury was prevented from considering this possibility the trial court's error "substantially prejudiced USI." Brief of Appellee and Cross–Appellant U.S. Industries, at 30.

■■■■■ It is axiomatic that since coconspirators are jointly and severally liable for all damages caused by a conspiracy, a private plaintiff need "not sue all the conspirators, but may choose to proceed against any one or more of them." *Wilson P. Abraham Const. Corp. v. Texas Indus. Inc.,* 604 F.2d 897, 904 n. 15 (5th Cir.1979), *aff'd sub nom. Texas Indus. Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981).[35] As a consequence, a defendant may be held liable for having participated in a conspiracy, even though his coconspirators are not defendants to the action.

■■■■ USI presented evidence that settling defendants—Robert Rice and Melby in particular[36]—had participated in the alleged conspiracy to defraud USI in the 1969 transaction.[37] And while the evidence

35. *Accord William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1053 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *Hennessey v. National Collegiate Athletic Ass'n,* 564 F.2d 1136, 1147 (5th Cir.1977); *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1245 n. 42 (3d Cir.1975); *Walker Distrib. Co. v. Lucky Lager Brewing Co.,* 323 F.2d 1, 8 (9th Cir.1963), *cert. denied,* 385 U.S. 976, 87 S.Ct. 507, 17 L.Ed.2d 438 (1966).

36. Rice testified that he was responsible for hiring Bond—a major actor in virtually all of the alleged state and federal law violations. 256 R. 1400. When Kennibec was acquired to facilitate the consolidation of all of the health spas, Rice and Melby became directors of the new corporation. 256 R. 1407. Rice participated in the selection of Touche as the auditor of Kennibec, and met with Touche at their office in Salt Lake City, Utah. 256 R. 1409–10. During Touche's audit of Kennibec, Rice argued to Touche that it should defer a smaller amount of income. 307 R. 12,953. Rice was also involved in selecting a potential underwriter for the proposed public offering of Kennibec. 256 R. 1412.

Moreover, Rice and Melby were the predominant parties in making the decision to sell Kennibec to USI. 256 R. 1419. Indeed, during negotiations, Rice flew to New York to visit USI.

When Kennibec was sold to USI, Rice and Melby were two of the three largest shareholders of Kennibec, 255 R. 1075, and each received between seven and eight million dollars from the sale. 258 R. 1830. After the sale, Rice became president of HI, and Melby became its vice-president. 255 R. 1075.

In addition, Rice and officers of USI discussed the problem of conflicts of interest within Kennibec in June 1969, before the sale of Kennibec to USI. 256 R. 1425–26; 256 R. 1428–29. At that time, he was aware that conflicts of interest or related party transactions existed within Kennibec. 256 R. 1359–60. In fact, one of the corporations involved in various conflicts of interest was Rice–Melby Corporation. 256 R. 1359–60. Among other things, Rice–Melby Corporation had an interest in the Highland Drive Spa, and in Odgen Investments. These companies formed the basis for two of USI's allegations of misrepresentation. 9 R. 1900–02.

37. The trial court's reasons for refusing to instruct the jury that the conspiracy and aiding and abetting claims could include both settling and trial defendants are somewhat unclear. Although at one point the court apparently asserted that USI had failed to proffer evidence on the conspiratorial involvement of the settling defendants, *see e.g.,* 323 R. 16,681–82, we do not believe that the trial judge's decision was prem-

was perhaps not overwhelming, it was sufficient to create an issue of fact for the jury. *J.I. Case Credit Corp. v. Crites*, 851 F.2d 309, 311 (10th Cir.1988).

Accordingly, the trial court should have instructed the jury that a defendant would be liable for the conspiracy and aiding and abetting claims arising out of the 1969 transaction if the jury found that the defendant had conspired with, or aided and abetted, any other defendant, or any other individual or business entity that had participated in the conspiracy. Similarly, the special verdict forms submitted to the jury should not have restricted the jurors to

finding a conspiracy among the codefendants. Rather, the list of potential coconspirators should either have named those settling defendants against whom evidence was presented, or have included a generic category such as "others not at trial."

 Despite our conclusion that the trial court erred when it limited the jury to finding a conspiracy among the trial defendants, the error requires reversal only if we conclude that the faulty jury instruction "affect[ed] the substantial rights of the parties." 28 U.S.C. § 2111 (1982); Fed.R. Civ.P. 61.[38] Where the verdict more probably than not was untainted by the error,[39]

ised on that ground. Nor, in our view, could it have been; as we have noted, USI presented sufficient evidence to create a question of fact regarding the involvement of settling defendants in the alleged conspiracies. *See Hardin v. Manitowoc–Forsythe Corp.*, 691 F.2d 449, 459 n. 7 (10th Cir.1982) ("When at the end of trial the judge decides which nonparties to submit as phantoms on the verdict form, the directed verdict standard must be applied."); *J.I. Case Credit Corp. v. Crites*, 851 F.2d 309, 311 (10th Cir.1988) ("The standard of review in assessing whether a trial court properly directed a verdict is … whether the evidence is sufficient to create an issue for the jury.").

Rather, from our reading of the record, it seems clear that the trial court declined to include settling defendants within the parameters of the instructions because of his concern that the trial defendants would, in effect, have to defend the settling defendants against the allegations made by USI. *See generally* 323 R. 16,681–86.

While we recognize and appreciate the court's concern that an aiding and abetting charge not be used by a plaintiff to evade the burden of establishing a primary violator, we believe that its concern is misplaced. By clearly instructing a jury on the aiding and abetting offense, a court can ensure that the plaintiffs retain their burden of proving all of the elements of the offense.

Moreover, if we were to accept the trial court's reasoning, a settlement by a primary violator would effectively discharge any aider and abettor from liability. Such a result, we believe, could only encourage parties to aid and abet unlawful schemes. Needless to say, this effect would not be desirable.

38. While Fed.R.Civ.P. 61, by its terms, applies only to district courts, "it is well settled that the appellate courts should act in accordance with the salutary policy embodied in Rule 61." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S.Ct. 845, 849, 78 L.Ed.2d 663 (1984). *See also* C. Wright & A. Miller, *Federal*

*Practice and Procedure* § 2882 (1973) ("[I]t is well settled that the appellate courts act in accordance with [Rule 61].").

39. We recognize that the circuits are divided on the appropriate standard of review to apply in gauging the effect of an error in a civil case. *Compare Haddad v. Lockheed California Corp.*, 720 F.2d 1454, 1459 (9th Cir.1983) (in nonconstitutional civil cases, an error is harmless if "the jury's verdict is more probably than not untainted by the error."), *McIlroy v. Dittmer*, 732 F.2d 98, 105 (8th Cir.1984) (same), *and Smith v. Chesapeake & Ohio Ry. Co.*, 778 F.2d 384, 389 (7th Cir.1985), *with McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 924–27 (3d Cir.1985) (standard of review for harmless error in a civil case should be the same as that in a criminal case, that is, errors "are not harmless unless it is 'highly probable' that they did not affect a party's substantial rights."), *and Aetna Casualty and Sur. Co. v. Gosdin*, 803 F.2d 1153, 1159 (11th Cir. 1986) ("[I]n civil cases courts should apply the same standard as announced in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), a criminal case."). We believe, however, at least in the context of the present case, that the correct standard to apply is the "more probable than not" standard. To begin with, it seems reasonable, absent some countervailing policy, that the harmless error standard should mirror the standard applied at trial. As Professor Saltzburg has noted:

[I]f the preponderance standard is used at trial, it would seem perfectly logical to use a similar test for judging error on appeal. Similarly, if great certainty is required, as in a criminal case with the 'beyond a reasonable doubt' standard, it would seem that the test on appeal should be equally stringent. Saltzburg, *The Harm of Harmless Error*, 59 Va.L. Rev. 988, 998 (1973). This circuit has previously implied that it would apply the lower standard in civil cases. *See, Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 531 (10th Cir.1987); *but see Anderson v. Deere &*

the error is harmless and a new trial is not required.[40] *Haddad v. Lockheed California Corp.*, 720 F.2d at 1459. In assessing the effect of the erroneous instruction, "we must not only consider 'the instruction as a whole, but ... the opening statements, the evidence and the closing arguments....' " *Smith v. Chesapeake & Ohio Ry.*, 778 F.2d at 389 (quoting *Alloy Int'l Co. v. Hoover–NSK Bearing Co.*, 635 F.2d 1222, 1227 (7th Cir.1980)).

 We are firmly convinced that the trial court's error in no way affected the substantial rights of the parties. From our examination of the special verdicts returned by the jury, it seems clear that the jury entirely rejected USI's substantive claim that the 1969 transaction was tainted by violations of state or federal law. No defendants were found liable on USI's claim of common law fraud in the 1969 transaction; and no defendants were held liable for any substantive securities law violations arising from the 1969 transaction. Indeed, the jury entirely rejected the existence of any violations—either of federal law or of state law—surrounding the sale of Kennibec to USI. As a result, the addition of the names of Melby and Rice to the list of potential coconspirators could not possibly have affected the jury's decision.

In sum, we conclude that the trial court's failure to properly instruct the jury on the

conspiracy and the aiding and abetting claims was harmless error.

## I. Prejudgment Interest

The third issue pressed by USI on appeal is whether the trial court erred in denying USI's motion for prejudgment interest. In its Memorandum Opinion Regarding Entry of Judgment, the trial court enumerated five factors it considered in determining whether to award prejudgment interest:

1) whether plaintiff has been diligent in prosecuting its action, 2) whether a defendant has been unjustly enriched, 3) whether such an award would be purely compensatory, 4) whether there exist countervailing equitable considerations that would militate against such an award, and ... [5) ] in the State of Utah, whether plaintiff's loss was fixed at a particular time and calculable with mathematical accuracy.

36 R. 7349. The court concluded that "no prejudgment interest ought to be awarded." 36 R. 7349.

The court found that USI had been diligent in prosecuting its claims. However, the court determined that an award of prejudgment interest would not be purely compensatory. "Under the court's [i]nstruction [on damages for breach of fiduciary duty],[41] the court noted, "the jury probably awarded any 'unjust gain' that defendants

---

Co., 852 F.2d 1244, 1246 n. 8 (10th Cir.1988) (citing *Chapman v. California*, 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967)).

Moreover, this suit does not involve any constitutional deprivations or violations that might argue for the application of a higher standard. Consequently, we hold that, absent some unusual countervailing circumstances, the appropriate standard of review in a civil case for determining whether an error was harmless is whether the substantial rights of the parties were more probably than not unaffected by the error.

**40.** "Harmless error analysis normally applies in civil cases ... and it specifically applies to faulty jury instructions." *Lusby v. T.G. & Y. Stores, Inc.*, 796 F.2d 1307, 1310 (10th Cir.1986).

**41.** In its instruction to the jury on USI's claim for damages for breaches of fiduciary duty, the trial court stated:

If you find that a Defendant has breached his fiduciary duty or is a conspirator to breach such duty, then you must consider what damages should be awarded against that Defendant.

The measure of damage for such breach or conspiracy is that Plaintiff is entitled to recover damages, if any, that are the natural and probable consequence of the breaches of fiduciary duty. In addition, if you find that the Defendant derived a gain from a breach of fiduciary duty, then you may award damages against that Defendant in the amount of such gain. Such fiduciary may be entitled to a reduction in the damages for the value of the contributions he made to the endeavor or opportunity.

Further, you may award punitive damages if you determine that the acts of a Defendant were done willfully and maliciously. If you do determine, be advised of the purposes of punitive damages as previously stated to you. 325 R. 17,016.

obtained as a result of their breaching action." 36 R. 7350. "In addition," the court continued, "plaintiff may have already been fully compensated by the jury verdict's 'lost investment' since, under Instruction # 73,[42] it could recover 'losses incurring as a result of its purchase [that] ... flowed directly from the purchase.'" 36 R. 7350.

While the court acknowledged the force of USI's argument that it was entitled to prejudgment interest "because of the 'degree of wrongdoing of the defendants,'" 36 R. 7350, the court decided that "the jury's awards of punitive damages ... ha[d] sufficiently addressed the factor of defendant's dishonest conduct." 36 R. 735. Finally, the court ruled that prejudgment interest was not available under Utah law "because plaintiff's damages were of such a nature that they had to be ascertained by the jury and were not calculable with mathematical accuracy prior to the jury's determination." 36 R. 7350.

USI strenuously challenges the trial court's refusal to grant prejudgment interest. First, USI questions the trial court's ruling that an award of prejudgment interest would "probably" duplicate damages awarded by the jury for the fiduciary duty and securities claims. In Jury Instruction No. 78, USI points out, the court expressly instructed the jury that "[u]nder the law, a claim for interest must be decided by the Court, not the jury. Therefore, i[f] you award damages, you should not consider

interest as a factor in your consideration." 324 R. 16,978. Under this jury instruction, USI insists, the jury could not have included interest in calculating USI's damages.

Next, USI argues that the trial court failed to give sufficient weight to the conduct of the defendants in deciding whether to award prejudgment interest. According to USI, "[a] substantial body of case law directs that an award of prejudgment interest is appropriate where the defendants' conduct has been in some sense fraudulent." Brief of Appellee and Cross–Appellant U.S. Industries, at 42.

Finally, USI attacks the trial court's finding that USI was not entitled to prejudgment interest under Utah law because USI's damages were not calculable with mathematical accuracy prior to the jury's determination. Under Utah law, USI asserts, an award of prejudgment interest is precluded only when "the plaintiff's injuries are ongoing and not complete as of the time of the initiation of the litigation." *Id.* at 44. In the present case, however, "USI's damages were fixed and complete as of the completion of the 1973 FEK transaction." *Id.* As a consequence, the trial court erred in concluding that prejudgment interest was not available to USI under Utah law.

▬▬ An award of prejudgment interest on a federal securities law claim is controlled by federal law. *Koehler v. Pulvers*, 614 F.Supp. 829, 849 (S.D.Cal.1985);

---

**42.** Instruction No. 73 reads as follows:

If you find that Plaintiff is entitled to recover actual damages for security law violations of one or more Defendants, then as I have explained to you, you must in awarding such damages consider the value of what Plaintiff gave in the securities transaction in question; and you must also consider the value of what Plaintiff received in such transactions. In determining such values you are [not] limited to consider any single factor or any single kind of evidence. Rather, you may consider all evidence that may pertain to value. Thus, you may consider the market price, if any, of the stock that was given or received; you may consider the book value, if any, of such stock; where a purchase or sale involved a substantial number of shares representing the controlling interest in an ongoing business, you may consider the worth, earnings and liabili-

ties of that business in finding the value of such shares. In mentioning these particular factors, I do not mean to limit your consideration in such factors. You are entitled to consider all evidence that may bear on the value or loss and to give such evidence as much or as little weight as you think it deserves.

In addition to its out-of-pocket losses, Plaintiff can recover losses occurring as a result of its purchase, if it can prove with reasonable certainty and by a preponderance of the evidence that such subsequent losses flowed directly from the purchase and are directly attributable to the conduct of the Defendant. That is, Plaintiff must prove that its subsequent losses were a reasonably foreseeable consequence of the misrepresentation or omission and that they actually resulted from the misrepresentation or omission.
324 R. 16,976–77.

*City Nat'l Bank v. American Commonwealth Fin. Corp.*, 608 F.Supp. 941, 942 (W.D.N.C.1985). Alternatively, state law governs the award of prejudgment interest on state law claims that are pendent to a federal claim. *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 692 n. 13 (2d Cir.1983); *Nedd v. United Mine Workers of Am.*, 488 F.Supp. 1208, 1212 (N.D.Pa.1980); *aff'd sub nom. Ambromovage v. United Mine Workers of Am.*, 726 F.2d 972 (3d Cir. 1984). In determining whether the trial court abused its discretion [43] in denying USI's motion for prejudgment interest in the present case, we must look to Utah law for the proper standard to apply in awarding prejudgment interest on the state law claims and to federal law for the standard to apply with respect to the federal securities claim. Because the standards differ we address them separately.

*Prejudgment Interest Under Utah Law*

Under Utah law, "[p]rejudgment interest may be awarded in a case where the loss is fixed as of a particular time and the amount of the loss can be calculated with mathematical accuracy." *Jorgensen v. John Clay and Co.*, 660 P.2d 229, 233 (Utah 1983).[44] "On the other hand, where damages are incomplete or cannot be calculated with mathematical accuracy, such as in cases of personal injury, wrongful death, defamation of character, false imprisonment, etc., the amount of damage must be ascertained and assessed by the trier of fact at the trial, and in such cases prejudgment interest is not allowed." *Bjork v. April Industries, Inc.*, 560 P.2d 315, 317 (Utah), *cert. denied*, 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1977). *Accord Uinta Pipeline Corp. v. White Superior Co.*, 546 P.2d 885, 887 (Utah 1976); *Fell v. Union Pac. Ry. Co.*, 32 Utah 101, 88 P. 1003, 1006 (1907).

■ It is undisputed that USI's loss from the 1973 transaction was fixed at the time that the sale of FEK took place. The first requirement for awarding prejudgment interest under Utah law is therefore met. The second requirement, however— that the amount of the loss be calculable with mathematical accuracy—is more difficult. USI's fiduciary duty and common law fraud claims arising from the 1973 transaction involved a variety of allegations of self-dealing, conflicts of interest, and misuses of corporate opportunities. For the most part, these allegations lacked the clarity that would have permitted them to be calculated "with mathematical accuracy."[45] Moreover, in some instances the claims appeared to be inconsistent with each other.[46]

In light of the lack of specificity and the contradictory nature of USI's claims—as well as elusive nature of the injury arising from some of the allegations of fraud and breach of fiduciary duty—we cannot say that the trial court abused its discretion in concluding that the damages were not cal-

**43.** The decision whether or not to allow prejudgment interest rests within the sound discretion of the trial court. *Michaels v. Michaels*, 767 F.2d 1185, 1204 (7th Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1310 (9th Cir.) *cert. denied*, 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982); *United States v. California State Bd. of Equalization*, 650 F.2d 1127, 1132 (9th Cir. 1981), *aff'd*, 456 U.S. 901, 102 S.Ct. 1744, 72 L.Ed.2d 157 (1982). Accordingly, the standard of review on appeal is whether the trial court abused its discretion in awarding—or in declining to award—prejudgment interest. *Vance v. American Hawaii Cruises, Inc.*, 789 F.2d 790, 794 (9th Cir.1986).

**44.** *Accord Firestone Tire and Rubber Co. v. Pearson*, 769 F.2d 1471, 1484 (10th Cir.1985); *Chris-*

*tenson v. Commonwealth Land Title Ins. Co.*, 666 P.2d 302, 308 (Utah 1983); *Staker v. Huntington Cleveland Irrigation Co.*, 664 P.2d 1188, 1191 (Utah 1983); *Anderson v. State Farm Fire & Casualty Co.*, 583 P.2d 101, 104 (Utah 1978); *Mason v. Western Mortgage Loan Corp.*, 754 P.2d 984, 987 n. 2 (Utah App.1988).

**45.** Indeed, the trial court criticized the lack of specificity surrounding USI's claims. *See, e.g.,* Hearing Transcript of March 10, 1982, at 3–4.

**46.** For instance, USI alleged—and sought to show—that because of defendant's state law violations, FEA purchased high quality health club contracts from HI on terms that were very unfavorable to HI. Somewhat inconsistently, USI also asserted that FEA purchased worthless health spa contracts from HI, in order to inflate FEA's book value.

culable with mathematical accuracy. Accordingly, we uphold the trial court's denial of prejudgment interest on the state law claims.

*Prejudgment Interest under Federal Law*

Under federal law, the rationale underlying an award of prejudgment interest is to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of judgment.[47] *See Vance v. American Hawaii Cruises, Inc.*, 789 F.2d 790, 794 (9th Cir.1986). Thus under federal law prejudgment interest is ordinarily awarded, absent some justification for withholding it. *See Chung, Yong Il*, 774 F.2d at 1056 (admiralty claim); *West v. Harris*, 573 F.2d 873, 883 (5th Cir.1978); *cert. denied*, 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979) (suit on policies issued under National Flood Insurance Act).[48]

Nonetheless, even where an award of prejudgment interest would serve to compensate the injured party, it is not recoverable as a matter of right. Rather, "[i]n addition to the compensatory principle, awards of prejudgment interest are governed by fundamental considerations of fairness." *Rolf*, 637 F.2d at 87.[49] As the Supreme Court noted in *Blau v. Lehman*, 368 U.S. 403, 413, 82 S.Ct. 451, 456, 7 L.Ed.2d 403 (1962), "Interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness." *Id.* at 414, 82 S.Ct. at 457 (quoting *Board*

---

**47.** *See also Chung, Yong Il v. Overseas Navigation Co.*, 774 F.2d 1043, 1057 (11th Cir.1985), *cert. denied*, 475 U.S. 1147, 106 S.Ct. 1802, 90 L.Ed.2d 346 (1986) ("Prejudgment interest ... is in the nature of compensation for the use of funds."); *Myron v. Chicoine*, 678 F.2d 727, 734 (7th Cir.1982) (quoting *Sanders v. John Nuveen & Co.*, 524 F.2d 1064, 1075 (7th Cir.1975), *vacated and remanded on other grounds*, 425 U.S. 929, 96 S.Ct. 1659, 48 L.Ed.2d 172 (1976)) ("The doctrinal basis for [a prejudgment interest] awards is that ... 'unless the plaintiff is paid interest for the entire time that he is deprived of the use of his money, he will not receive full compensation.'"); *Rolf v. Blyth, Eastman, Dillon & Co.*, 637 F.2d 77, 87 (2d Cir.1980) ("A damage award without prejudgment interest ... would not give [the plaintiff] full compensation for the losses he suffered ..."); *Norte & Co. v. Huffines*, 416 F.2d 1189, 1191 (2d Cir.1969), *cert. denied*, 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970) ("An award of [prejudgment interest] is, in the first instance, compensatory ..."); C. McCormick, *Handbook of the Law of Damages*, § 50 (1935) ("[Prejudgment interest is] compensation allowed by law ... as additional damages for loss of use of the money due as damages during the lapse of time since the accrual of the claim.").

**48.** We recognize that the cases cited for the proposition that prejudgment interest should be awarded absent countervailing equities involve admiralty law and recovery under the National Flood Insurance Act, rather than federal securities law. However, we do not believe that the distinction is germane in this instance. As the court noted in *Nedd v. United Mine Workers of Am.*, 488 F.Supp. 1208 (M.D.Pa.1980), *aff'd sub nom. Ambromovage v. United Mine Workers of Am.*, 726 F.2d 972 (3d Cir.1984), "the Union argues that admiralty cases ... lay down unique rules that have no applicablity to non admiralty actions. The short but complete answer to the parties' contentions is that the decisional law does not recognize these fine distinctions." *Id.* at 1220 n. 16.

**49.** *See also Michaels*, 767 F.2d at 1204 ("The decision [whether or not to award prejudgment interest] requires a balancing of the equities under the circumstances of the particular case."); *Riseman v. Orion Research, Inc.*, 749 F.2d 915, 921 (1st Cir.1984) (quoting *Chris–Craft Indus., Inc. v. Piper Aircraft Corp.*, 516 F.2d 172, 191 (2d Cir.1975), *rev'd on other grounds*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977)) ("An award of prejudgment interest in a case involving violations of securities laws rests within the equitable discretion of the district court to be exercised according to considerations of fairness."); *Chicoine*, 678 F.2d at 734 ("[T]he decision to award prejudgment interest rests in the sound discretion of the adjudicatory tribunal and involves a balancing of the equities between the parties under the circumstances of the particular case."); *California State Bd. of Equalization*, 650 F.2d at 1132 ("Awards of prejudgment interest are governed by considerations of fairness...."); *Norte & Co.*, 416 F.2d at 1191 ("[T]he Court's discretion in awarding prejudgment interest should be based on fundamental 'considerations of fairness.'"); *City Nat'l Bank v. American Commonwealth Fin. Corp.*, 608 F.Supp. 941, 942 (D.C.N.C.1985) *aff'd*, 801 F.2d 714 (4th Cir.1986), *cert. denied*, 479 U.S. 1091, 107 S.Ct. 1301, 94 L.Ed.2d 157 (1987) quoting *Wolf v. Frank,* 477 F.2d 467, 479 (5th Cir.), *cert. denied*, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973)) ("Whether prejudgment interest should be awarded on a damage recovery in a security fraud case 'is a question of fairness resting within the District Court's sound discretion'"). *See generally Nedd*, 488 F.Supp. at 1216–19.

*of Comm'rs v. United States*, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313 (1939)).

In short, an award of prejudgment interest under federal law is governed by a two-step analysis. First, the trial court must determine whether an award of prejudgment interest would serve to compensate the injured party. Second, when an award would serve a compensatory function, the court must still determine whether the equities would preclude the award of prejudgment interest.

■■■ Here the trial court concluded that an award of prejudgment interest would "probably" duplicate damages awarded by the jury for the securities and fiduciary duty claims. If true, an award of prejudgment interest would clearly have been improper; "prejudgment interest is not allowed when it is not a necessary element of compensation." *West v. Harris*, 573 F.2d 873, 883 (5th Cir.1978), *cert. denied*, 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979). We are convinced, however, that the trial court's determination that the jury had likely included prejudgment interest in its award of damages was incorrect. In its instructions the court specifically told the jury that it was *not* to consider interest as a factor when it calculated damages. 324 R. 16,978. It must be presumed that the jury understood and followed its instructions. *Weber v. Continental Casualty Co.*, 379 F.2d 729, 731 (10th Cir.1967); *Beaver v. Fidelity Life Ass'n*, 313 F.2d 111, 114 (10th Cir.1963). Thus we must hold that the jury did not include prejudgment interest in its award of damages.

■■■ Moreover, we are also convinced that the equities in this case did not so favor the defendants that the trial court could have, within its discretion, refused to award prejudgment interest on the award of damages for the federal securities law claim. To begin with, "an award of prejudgment interest is particularly appropriate in cases of investment fraud," *Chicoine*, 678 F.2d at 733, and in cases involving a breach of fiduciary duty. *Rolf*, 637 F.2d at 87; *Norte & Co.*, 416 F.2d at 1191; *City Nat'l Bank*, 608 F.Supp. at 943. In particular, where a defendant's behavior has involved dishonest or fraudulent conduct, the equities favor an award of prejudgment interest as compensatory damages.[50] *See City Nat'l Bank*, 608 F.Supp. at 943 ("In deciding whether an award is in accord with 'fundamental fairness' the Court should assess the personal wrongdoing of the defendants.").

Furthermore, under the factors applied by the trial court it seems clear to us that the equities favored the award of prejudgment interest. The trial court found, and it is undisputed on appeal, that USI pursued its claim diligently. And while the trial court did not expressly address whether a defendant had been unjustly enriched, it seems indisputable that unjust enrichment was an element of USI's claims.[51] Finally, the trial court cited no countervailing eq-

---

**50.** In its Memorandum Order, the trial court failed to give much weight to the defendants' conduct because "the jury's awards of punitive damages ... have sufficiently addressed the factor of defendants' dishonest conduct." 36 R. 7350. However, we agree with USI that the trial court's analysis "confused the factors of punitive damages and compensatory awards of prejudgment interest." Brief of Appellee and Cross–Appellant U.S. Industries, at 42. The purpose of prejudgment interest is to fully compensate the injured party for his loss; it is not to punish the wrongdoer. The personal behavior of the defendants is a factor to be considered only for the limited purpose of deciding whether the equities override the goal of fully compensating the plaintiff. *See, e.g., Paper Converting Mach. Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 23 (Fed.Cir.1984) ("[The purpose of prejudgment interest] is to compensate for the delay a patentee experiences in obtaining money he would

have received sooner if no infringement had occurred.... On the other hand, damages are trebled as punishment. There is no conflict in the award of both.").

**51.** For instance, in its Instruction No. 97, the court directed the jury that unjust enrichment was a element of damages that could be recovered for breach of fiduciary duty.

> The measure of damages for ... breach or conspiracy [to breach a fiduciary duty] is that the Plaintiff is entitled to recover damages, if any, that are the natural and probable consequence of the breaches of fiduciary duty. *In addition if you find that the Defendant derived gain from a breach of fiduciary duty, then you may award damages against that Defendant in the amount of such gain.*

324 R. 17,016 (emphasis added).

uitable considerations that would militate against an award of prejudgment interest. Indeed, the factor of the personal wrongdoing of the defendants favored an award of prejudgment interest.

In sum, we hold that the trial court abused its discretion in declining to grant prejudgment interest to USI on the $550,000 in damages awarded for defendants' violations of federal securities law and such interest is to be awarded on remand.[52]

### J. Duplication in the Award of Damages

USI next argues that the trial court erred in reducing the jury verdict by $550,000 because of duplication. When the jury returned the supplemental special verdict, it awarded USI $550,000 in damages for its 10b–5 claims, and $614,000 for its fiduciary duty claims. However, defendants immediately objected to the verdict on the ground that the two awards appeared to be partially duplicative. According to the defendants, the jury could have awarded $614,000 in damages for USI's breach of fiduciary duty claims only by subsuming the $550,000 federal securities law award within the fiduciary duty award.

On the initial special verdict forms, defendants noted, the jury assessed damages of $32,000 against Bond and Leonard Rice, for a total of $64,000. In addition, Bond, Leonard Rice, Brent Rice, Peterson, Four Seasons and Barlow were found liable for conspiracy to breach a fiduciary duty, and damages of $10,000 were awarded against each of them. From the original special verdict forms, therefore, the total damages arising from the fiduciary duty claims could have been either $64,000—the award against Bond and Leonard Rice—or $124,000—the sum of the breach of fiduciary duty awards and the conspiracy awards. In either case, however, the supplemental

special verdict award of $614,000 diverged widely from the original verdict. Indeed, the initial special verdict award could be harmonized with the supplemental special verdict award only if the jury had reached the figure set out in the supplemental special verdict by adding the 10b–5 award of $550,000 to its original fiduciary duty award of $64,000. The total of those two awards, defendants pointed out, was identical to the $614,000 fiduciary duty award contained in the supplemental special verdict.

As a result of the purported duplication, defendants requested the court to submit an additional interrogatory to the jury asking whether the fiduciary duty award included the federal securities law award. 329 R. 143. The court declined to submit additional interrogatories to the jury, concluding that "the verdict could be construed in such a way as to avoid any inconsistency." 36 R. 7340. The verdicts were accepted and the jury was excused.

USI filed a Motion for Entry of Judgment. Hearings on the motion were held and the court filed its Memorandum Opinion Regarding Entry of Judgment. The court concluded that the 10b–5 award did in fact duplicate the fiduciary duty award. The court based its decision on five factors. First, the court was struck by the fact that the supplemental special verdict's fiduciary duty award was remarkably dissimilar to the jury's initial verdict if not viewed as duplicating the 10b–5 award, and identical to the jury's initial verdict if read as including the award for the 10b–5 claim. Next, the court was persuaded that the jury had merely added the original 10b–5 and fiduciary duty awards to reach the award of damages for breach of fiduciary duty set out in the supplemental special verdict due to the fact that the jury had deliberated for

---

**52.** We recognize that courts have disagreed over the appropriate rate to apply in an award of prejudgment interest on federal claims. *Compare, e.g., Stertz v. Gulf Oil Corp.*, 616 F.Supp. 136, 138 (E.D.N.Y.1985), *vacated on other grounds*, 783 F.2d 1064 (Em.App.1986) ("Although the decision whether to award prejudgment interest here is governed by federal law, federal courts look to state law in order to

determine the appropriate rate."), *with Koehler v. Pulvers*, 614 F.Supp. 829, 850 (S.D.Cal.1985) (applying "the average rate for money market instruments in federal funds during the relevant period."). The interest rate question was not briefed in these appeals. This question should be determined by the district court in making the award of prejudgment interest on the federal securities claims.

only a brief time before returning the supplemental special verdict. Such a short period for deliberating, the court inferred, would not have permitted the jury to reexamine the measure of damages for the fiduciary duty claims in any detail.

The third factor relied on by the judge in determining that the damages awarded for the 10b–5 and fiduciary duty claims were duplicative was the fact that at the time of trial, USI "never differentiated between the damages it suffered as a result of the different FEA causes of action." 36 R. 7344. In particular, the court noted that the testimony of USI's expert witness, Mr. Liddell, failed to distinguish between damages arising out of one FEA claim from those arising from another FEA claim. The court determined that the jury could easily have decided that "all of the components of plaintiff's damages from the FEA transaction were recoverable for a violation of Rule 10b–5." 36 R. 7345.

In addition, the court recognized that its "instructions on the measure of damages for securities fraud were substantially similar ... to the damage instruction for conspiracy to breach fiduciary duties." 36 R. 7346. This similarity, the court found, "could [have] lead to duplication in the verdicts rendered." 36 R. 7345. Finally, the court noted that both claims " 'arose from the same, identical, operative facts' ... and were based on the same acts of defendants." 36 R. 7343.

On appeal, USI argues that the trial court erred in concluding that part of the fiduciary duty award duplicated the 10b–5 award.[53] The burden of proving duplication, USI emphasizes, rests with the party challenging the award. Accordingly, a verdict should be sustained unless the party claiming duplication demonstrates "that the damages assessed against it have 'in fact and in actuality' been previously covered." Brief of Appellee and Cross–Appellant U.S. Industries, at 37 (quoting *Wood v. Diamond M Drilling Co.*, 691 F.2d 1165, 1171 (5th Cir.1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 947 (1983)). However, USI asserts that defendants were unable to prove duplication "in fact and in actuality." Rather, they were able to show at most "only some uncertainty as to whether the jury's damages [were] duplicative." *Id.* at 39. As a consequence, USI concludes, the court's determination was error "because it was based only on ... guesswork as to what line of reasoning the jury had followed rather than on a clear demonstration that duplication had occurred." *Id.* at 37.

We do not agree. While a plaintiff "is entitled to proceed on various theories of recovery, the theories must be pursued with caution [to avoid duplication]." *Bold v. Simpson*, 802 F.2d 314, 321 (8th Cir.1986). "Where jury awards under two separate counts represent a duplication of damages, a plaintiff should be limited to recovery under only one count." *Praprotnik v. City of St. Louis*, 798 F.2d 1168, 1178 (8th Cir.1986), *rev'd on other grounds*, — U.S. —, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Westerman v. Sears, Roebuck & Co.*, 577 F.2d 873, 879 (5th Cir.1978).[54] If a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery. *Clappier*, 605 F.2d at 529–530. Where a jury award duplicates damages, "the court should, at the conclusion of the trial, either on its own initiative

---

**53.** The question whether damage awards are duplicative is one of fact. *Bartholomew v. Universe Tankships, Inc.*, 279 F.2d 911, 918 (2d Cir.1960). As such, it is reviewable under the clearly erroneous standard. *See State v. Northwestern Constr., Inc.*, 741 P.2d 235, 240 (Ala. 1987) (trial court's finding "that no double recovery occurred cannot be overturned unless clearly erroneous.").

**54.** *See also American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 13, 71 S.Ct. 534, 539, 95 L.Ed.

702 (1951); *Clappier v. Flynn*, 605 F.2d 519, 531 (10th Cir.1979) ("[D]ouble recovery is precluded when alternative theories seeking the same relief are pled and tried together."); *Stringer v. Dilger*, 313 F.2d 536, 541 (10th Cir.1963) ("[A]n injured party may recover damages only for the actual loss he suffered and no more; he is to be made whole, but not entitled to be put in a better condition than he would be in had the wrong not been committed.").

or on motion of a party, reduce the judgment by the amount of [the duplication], and thereby prevent double recovery." *Ohio Casualty Ins. Co. v. Brundage*, 674 P.2d 101, 102 (Utah 1983) (quoting *Laub v. South Cent. Utah Tel. Ass'n, Inc.*, 657 P.2d 1304, 1307 (Utah 1982)).

▆ The five factors enumerated by the trial court were sufficient to convince it that the 10b–5 and the fiduciary duty awards were duplicative. To begin with, the plaintiff's federal securities law claim and the state breach of fiduciary duty claim occurred in the same transaction— the 1973 transaction. And while the damages that could be awarded were not necessarily identical for the two claims,[55] the trial judge's finding on duplication is not clearly erroneous.

Moreover, we are not convinced that the trial court's determination was the product of improper speculation, as USI charges.[56] The court specifically acknowledged that " 'the burden is on the one claiming duplication to show that the damages assessed against it have in fact and in actuality been previously covered.' " 36 R. 7343 (quoting *Wood v. Diamond M Drilling Co.*, 691 F.2d 1165, 1171 (5th Cir.1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d

947 (1983)). Subsequently, the court stated that "*given the burden of proof* the court can ... say *with certainty* that duplication occurred in the jury's FEA Rule 10b–5 and conspiracy to breach claims." 36 R. 7344 (emphasis added). The court later reiterated its conclusion that "sufficient evidence was presented to tip the scales of persuasion in defendants' favor as to duplication between the FEA Rule 10b–5 damages and the conspiracy damages." 36 R. 7347. We believe the trial judge's determination was based on substantive evidence and was not the product of improper speculation.

In sum, we hold that the trial court's finding of duplication was not clearly erroneous and affirm its reduction of the jury verdict by $550,000.

### K. Partial Credit for Settlement

The final issue raised by USI on appeal is whether the trial court erred when it allowed the defendants credit for money received by USI in settlements.

As noted earlier, *see supra* section C, after trial the district court allowed the defendants to set off against the jury verdict the amount of settlement allocated by USI to the FEA related claims—$444,719—

---

**55.** In its claim for breach of fiduciary duty USI was entitled to recover any gain derived by the defendants from their breach of fiduciary duty. *See, e.g.,* 324 R. 17,016. Under the 10b–5 claim, however, USI's award of damages was limited to its out-of-pocket losses and subsequent losses that occurred as a result of the securities violation. *See, e.g.,* 324 R. 16,976–77.

**56.** USI's argument is primarily based on the language used in the Memorandum Opinion Regarding Entry of Judgment. The trial court's language throughout its opinion, USI stresses, "makes it dramatically clear that the trial court based its finding of duplication on ... speculation. For example, the trial court reasoned that a comparison of the jury's damage instructions suggested that the similarity in the damage measures "*could* lead to duplication." ... Again, the court surmised that under its 10b–5 damage instruction, "the jury *could easily have*" awarded USI all components of its FEA damages, and that "given the testimony of Mr. Liddell, plaintiff's expert witness, such a result *could be expected."* Brief of Appellee and Cross–Appellant U.S. Industries, at 37.

While it is true that the trial court used the past perfect tense in its opinion, rather than the past tense, we are not convinced that any significance should be attached to that grammatical fact. To begin with, since it is impossible to ever determine with complete accuracy what occurs during jury deliberations, courts commonly use the past perfect tense when considering the actions of a jury. *See, e.g., In re IBP Confidential Business Documents Litig.,* 755 F.2d 1300, 1318 (8th Cir.1985) ("[The plaintiff's] inability to obtain subsequent employment is more appropriately characterized as an element of damages for libel and an award upon any separate claim *could well be* a duplication of damages."). Furthermore, despite any stylistic quirk on the part of the trial court, we believe that the opinion, when read in its entirety, makes it quite clear that the court was convinced by the facts and circumstances surrounding the jury award that the 10b–5 award was duplicated in the fiduciary duty award. As such, we reject the contention that the court's determination was speculative and based on guesswork.

and the value of Schoonmaker's consulting services—$100,000.[57] Despite the fact that the allocations to the FEA claims had been made by USI, however, USI now argues that the defendants should not have received credit for any of the settlement amounts relating to the FEA claims. Trial defendants are entitled to credit for sums received in settlement, USI asserts, "only if the defendant[s] conclusively demonstrate[ ] that the settlement and the jury's damage award are in fact duplicative." Brief of Appellee and Cross–Appellant. U.S. Industries, at 66. USI contends that the defendants have failed to meet their burden of proving that the settlement amounts duplicated the jury verdict.

USI concedes that it received $444,719 for settling claims relating to the FEA transaction. However, USI points out, the settlement agreements only allocated that amount to the specific *transaction;* it did not allocate the money received in settlement among the various *claims.* Thus, the settlements covered the FEA claims for conspiracy, aiding and abetting, breach of fiduciary duty, securities law violations, common law fraud, and punitive damages. While some of these causes of action—such as the conspiracy and the 10b–5 claims—lead to joint and several liability, others—including the claims for common law fraud and punitive damages—are claims for which liability is several and independent only. Since credit should not be granted for amounts received in settlement of the several and independent claims, the defendants are entitled to credit only for the settlement amounts relating to the joint and several claims. The defendants failed to establish what portion of the $444,719 was intended to cover the joint and several claims, and what part related to the several and independent claims. As a consequence, the defendants should be denied

any credit for the settlement amounts since "the risk of uncertainty should be placed on the wrongdoer, rather than the innocent party." *Id.* at 73 (quoting *Barnes v. United States,* 685 F.2d 66, 69 (3d Cir.1982)).

■■■ We agree with USI that as a general rule, a party seeking credit for an amount received in settlement bears the burden of proving "that the damages assessed against him have in fact and in actuality been previously covered in a prior settlement...." *Cates v. United States,* 451 F.2d 411, 417–18 n. 20 (5th Cir.1971).[58] Moreover, we also agree that the defendants have failed to show "in fact and in actuality," *Cates,* 451 F.2d 417–18 n. 20, that the $444,719 received by USI in settlement of its claims relating to FEA mirrors the joint and several claims on which it recovered at trial.

■■■ Nonetheless, for two reasons we resist the conclusion drawn by USI from those facts: that the defendants are not entitled to credit for the amounts received in settlement of the FEA claims. First, we believe that USI's argument must be rejected as inconsistent with the one satisfaction rule. As we have noted earlier, the one satisfaction rule provides that, under ordinary circumstances, an injured party may recover only once for an injury he has incurred. Its focus, therefore, is directed at the victim's *injury,* and not at the causes of action that may arise from that injury. *See e.g.,* Restatement (Second) of Torts § 885(3) (1977) ("A payment by any person made in compensation of a claim *for a harm for which others are liable as tortfeasors* diminishes the claim against the tortfeasor, at least to the extent of the payment made.") (emphasis added). Where a single injury gives rise to more than one claim for relief, a plaintiff may recover his damages under any claim, but he may re-

---

**57.** USI's challenge to the trial court's grant of credit extends only to the $444,719 allocated to the FEA claims. It does not question—and we therefore do not consider—whether the trial court erred in granting the defendants a credit of $100,000 for the value of Schoonmaker's consulting services.

**58.** *See Wood v. Diamond M Drilling Co.,* 691 F.2d 1165, 1171 (5th Cir.1982) (same); *Howard v. General Cable Corp.,* 674 F.2d 351, 358 (5th Cir.1982) ("The burden of proving common damages rests with the appellant because it was the party that sought the credit."). *See also Phillips v. Liberty Mut. Ins. Co.,* 813 F.2d 1173, 1176 (11th Cir.1987); *Hill v. Budget Fin. & Thrift Co.,* 383 S.W.2d 79, 83 (Tx.App.1964).

cover them only once. If a jury awards damages for two claims, both of which compensate for the same harm, the verdict must be reduced so that the plaintiff is only compensated once for the injury he has suffered. *Praprotnik v. City of St. Louis,* 798 F.2d 1168, 1178 (8th Cir.1978), *rev'd on other grounds,* — U.S. —, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

In the instant case, the various claims arising from the FEA transaction represented nothing more than different theories that would have allowed USI to be compensated for one injury—the creation, operation and sale of FEA.[59] Accordingly, it seems clear that the jury's award of damages on the FEA related claims duplicated the amounts allocated to FEA that USI received in settlement.

Moreover, even if we were not convinced that the $444,719 allocated to FEA in the settlement agreements compensated USI for the same injury as part of the jury award, in the context of this case we would still hesitate to impose on the defendants a penalty on the theory that they did not demonstrate that the settlement amounts and the jury award represented common damages. The settlement agreements were drafted by the parties to the agreements—USI and the settling defendants. The terms of the agreements were the result of negotiations between the parties. The separate categories to which the sums were allocated were made by the parties, as were the allocations themselves. In other words, every facet of the agreements was controlled by the parties to the agreements. By contrast, the trial defendants were not parties to the settlement agreements.

Under these circumstances, any ambiguity in the agreements as to the proper allocations of the settlement amounts was due solely to the failure of USI and the settling defendants to clearly articulate the injury each specific allocation was intended to compensate. To hold that, as a result of that ambiguity, the defendants would not be entitled to credit for any of the settlement amounts would be to reward USI for constructing an ambiguous settlement agreement.

This we decline to do. In this context, it would be inequitable to require the trial defendants to show "that the damages assessed against [them] have in fact and in actuality been previously covered in a prior settlement." *Cates,* 451 F.2d 417–18 n. 20. Rather, we believe that where a plaintiff settles with some defendants, and the non-settling defendants are not parties to the settlement agreements, the non-settling defendants need show only that the plaintiff settled claims with other parties on which the non-settling defendants were found liable at trial. If the defendants make this showing, the burden then shifts to the plaintiff to prove that, under the terms of its agreement with the settling defendants, the settlement did not represent common damages with the jury award. *See, e.g., Dionese v. City of West Palm Beach,* 500 So.2d 1347, 1349 (Fla.1987) (where a settlement agreement fails to apportion proceeds among the separate and distinctive causes of action, the total amount of the settlement must be set off from the entire verdict); *Knox v. Los Angeles County,* 167 Cal.Rptr. 463, 469, 109 Cal.App.3d 825 (1980) (absent good faith allocation of set-

---

**59.** In its reply brief, USI appeared to recognize that in determining whether the defendants were entitled to credit for amounts received in settlement, the critical focus must be on the injuries suffered by USI, and not on the claims under which it was compensated. Indeed, at the outset of its discussion of the settlement question, USI framed the issues as follow:

[T]he crucial questions before the Court with respect to the trial court's allowance of credit to the defendants for amounts received in settlement by USI are: (1) For what *injuries* was USI compensated through settlement agreements with former defendants, and (2)

are the *injuries* for which USI received settlement compensation the same as the *injuries* for which the jury awarded damages.

Reply Brief of Cross–Appellant U.S. Industries, at 17 (emphasis added). Later in its brief, USI reiterated the same theme:

The fact that USI alleged the existence of an "overall conspiracy" does not demonstrate that USI suffered only a single *injury.* The evidence in this case is, to the contrary, that USI has consistently claimed that it suffered a series of *injuries* as a result of the defendants' misconduct....

*Id.* at 18 (emphasis added).

tlement consideration between causes of action in which joint tortfeasor status was alleged, defendants were entitled to setoff of entire settlement figures).

In sum, we hold that the trial court's decision to grant the defendants credit for $544,719 received in settlement by USI was not clearly erroneous.

## IV. CONCLUSION

We are convinced that the trial judge afforded an eminently fair trial in this exceptionally complex, lengthy litigation. With the one exception noted as to prejudgment interest on the federal securities claim which can be addressed by modifying the judgment on remand, we are satisfied that no reversible error is demonstrated in his rulings and judgment. Accordingly, with the exception of that one modification to be made on remand, the judgment is

AFFIRMED.